FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUL 0 2 2009 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X   Index No.: _____/2009

CEDARBROOK PARTNERS,

                            Plaintiff,                          **COMPLAINT**

            - against -

INNOVATIVE CAPITAL FUND, L.L.C.,
INNOVATIVE CAPITAL MANAGEMENT, LLC
and YEHUDAH BELSKY,

                            Defendants.
------------------------------------------------------------X

**TOWNES, J.**
**AZRACK, M.J.**

        Plaintiff Cedarbrook Partners ("Cedarbrook" or the "Plaintiff"), by its attorneys, Grushko

& Mittman, P.C., as and for its Complaint against Defendants Innovative Capital Management

LLC ("Innovative") Innovative Capital Fund, L.L.C. (the "Fund") and Yehudah Belsky

("Belsky") (Innovative, the Fund and Belsky collectively referred to as the "Defendants"),

respectfully alleges as follows:

                        **PRELIMINARY STATEMENT**

        This is an action for fraud and breach of contract.  On December 26, 2006, and again on

August 2, 2007, the Plaintiff wired funds to the Fund pursuant to which Cedarbrook was to

invest in the Fund.  The Fund was managed by Innovative and Belsky.  The Fund was purported

to be created for the purposes of investing in various securities including futures contracts,

options on futures contracts, and/or other futures-related interests with the objective of capital

appreciation and income on behalf of Cedarbrook and other investors in the Fund.  In order to

induce Cedarbrook to invest in the Fund, and not withdraw its investment from the Fund, the

Fund, Belsky and Innovative provided representations to Cedarbrook regarding the past

performance and the then current activities of the Fund.  In fact, the representations were

knowingly false when made.  As a result of fraud and breaches of contract by Innovative, the

Fund and Belsky Cedarbrook was damaged in an amount to be determined at trial but not less than $300,000.

## PARTIES

1.      Plaintiff Cedarbrook Partners is a partnership residing in the state of New York with an office at 20 East Sunrise Highway, Valley Stream NY 11581.

2.      Defendant Innovative Capital Management, L.L.C. is a limited liability company formed under the laws of the State of New York with an office at 4205 Avenue M, Brooklyn, New York, 11234.  Upon information and belief Belsky was the sole member and manager of Innovative.

3.      Defendant Innovative Capital Fund, L.L.C. is a limited liability company formed under the laws of the State of New York with an office at 4205 Avenue M, Brooklyn, New York, 11234.  Upon information and belief Innovative was the sole manager of Innovative Capital Fund, L.L.C. (the "Fund").

4.      Defendant Yehudah Belsky is a natural person with an address at 1368 East 31st Brooklyn New York, 11210.

## VENUE

5.      Jurisdiction is based on 28 USC §1331 in that some of the causes of action arise under the laws of the United States.

6.      Venue is proper in this district pursuant to 28 USC §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and the Defendants reside in this District.

## FACTUAL ALLEGATIONS

7.      Jacob Spinner ("Spinner") is the general partner of Cedarbrook.

8.      Spinner was a friend and business acquaintance of Belsky since about 1990.

9.      At two times prior to 2006, Cedarbrook invested funds with a Cambridge Trading, LLC, an investment fund managed by Belsky (the "Previous Investments").

10.     In 2005, Belsky became an employee of a new employer.  The new employer required Belsky to return to investors all the funds he was managing for outside investors on behalf of Cambridge Trading, LLC.

11.     Belsky returned the funds from the Previous Investments to Cedarbrook.

12.     In late December 2006, sometime after Belsky left the employment of the new employer, Belsky called Spinner and informed Spinner that Belsky was re-launching his investment fund and solicited Cedarbrook's investment in the fund.

13.     In late December 2006, Belsky, Innovative and the Fund provided Spinner with numerous positive oral reports of the past and then current market performance of the Fund.

14.     Belsky was the sole natural person with control over the Fund and the only natural person Cedarbrook dealt with in relation to the Fund.

15.     Innovative purported to be using the funds it was receiving from Cedarbrook and its other investors for the purposes of investing in certain securities futures contracts, options on futures contracts, and/or other futures-related interests with the objective of capital appreciation and income ("Investment Strategies").

16.     Belsky further represented to Cedarbrook that if at any time the value of Cedarbrook's investment in the Fund diminished by 20% Belsky and Innovative would redeem Cedarbrook's investment in the Fund in cash.

17.     In reliance on these knowingly false claims of the Fund's past and current performance and false claims of how the Fund would use the funds to be invested by Cedarbrook

with the Fund, on December 26, 2006, Cedarbrook, in accordance with Spinner's course of dealings with Belsky, entered into an oral contract with the Fund, Innovative and Belsky pursuant to which Cedarbrook invested $200,000 in the Fund which Innovative and Belsky would use for the Investment Strategies on behalf of Cedarbrook.

18.     Innovative prepared a private placement memorandum for investors in the fund which described Innovative's obligations and memorialized the false statements Belsky, the Fund and Innovative made to Cedarbrook.  A copy of the private placement memorandum is attached hereto as Exhibit A.

19.     Cedarbrook fully performed all its obligations in connection with the investment by having $200,000 wired to the Fund on Cedarbrook's behalf.

20.     The Fund was then obligated to use Cedarbrook's funds for the Investment Strategies.

21.     From December 26, 2006, through August 2, 2007, Spinner had numerous conversations regarding the status of Cedarbrook's investment in the Fund and Belsky, Innovative and the Fund continued to provide Spinner and Cedarbrook with knowingly false reports of the Fund's success.

22.     In July 2007, Spinner spent a weekend with Belsky at Belsky's summer home in the Catskill Mountains.  Belsky told Spinner at that time that the Fund was up about 18 percent for the year and Belsky solicited additional investments from Cedarbrook.

23.     Belsky informed Spinner that Cedarbrook's original $200,000 investment was then worth $230,000.  In fact the initial $200,000 had not been invested on behalf of Cedarbrook nor used for Investment Strategies and there were no profits.

24.     In reliance on these additional knowingly false reports, on August 2, 2007, Cedarbrook, in accordance with Spinner and Cedarbrook's course of dealings with Belsky and Innovative, entered into an oral contract with Belsky, the Fund and Innovative pursuant to which Cedarbrook invested an additional $70,000 and rolled over its $30,000 "profit" to bring Cedarbrook's total principal investment in the Fund managed by Innovative and Belsky to $300,000 all of which was to be used for the Investment Strategies on behalf of Cedarbrook.

25.     Cedarbrook fully performed all its obligations under the contract by having an additional $70,000 wired to Innovative on Cedarbrook's behalf.

26.     In February of 2008, Cedarbrook desired to use its investment in the Fund as collateral to secure a loan from the Gruss Monument Fund to Yeshiva Ketana of Long Island.

27.     At this time Belsky, the Fund and Innovative continued to perpetrate the fraud by providing a letter to Cedarbrook that established and verified the value of Cedarbrook's investment in the Fund at not less than $315,000. A copy of the letter is attached hereto as Exhibit B.

28.     In early 2008, Cedarbrook learned that, contrary to Belsky's representations, Innovative, the Fund and Belsky had not invested the funds provided by Cedarbrook in the Fund on Cedarbrook's behalf nor used the funds invested by Cedarbrook for the Investment Strategies.

29.     Innovative, the Fund and Belsky had misappropriated the funds and used the funds provided by Cedarbrook for their own purposes and not on behalf of Cedarbrook.

30.     The statements made by Innovative, the Fund and Belsky regarding the Fund's performance were false when made because no investment had been made.

31.     Belsky later admitted in writing that he had betrayed Spinner's trust and friendship and promised to make good on returning Cedarbrook's principal investment in the Fund. A copy of the email is attached hereto as Exhibit C.

32.     On December 18, 2008, the United States Commodity Futures Trading Commission ("CFTC") instituted proceedings and made findings and imposed sanctions against Innovative and Belsky for perpetrating a fraud against five other investors in the Fund between September 2006 and February 2008. A copy of the CFTC order is attached hereto as Exhibit D.

33.     The CFTC proceeding reveals Belsky and Innovative perpetrated the same fraud on other investors as perpetrated on Cedarbrook.

34.     Upon information and belief Belsky and Innovative misled the CFTC regarding the nature of Cedarbrook's investment in the Fund.

35.     Upon information and belief Belsky and Innovative described Cedarbrook's investment to the CFTC as a loan to the Fund and not an investment.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Violation of Section 10b and Rule 10b-5 of the
### Securities Exchange Act of 1934 against Belsky, Innovative and the Fund)

36.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 35 as if fully set forth herein.

37.     Belsky, Innovative and the Fund represented to the Plaintiff that the Fund was using other investors' funds for the Investment Strategies, would also be using Cedarbrook's funds, for the Investment Strategies and that the Fund had substantial success using the Investment Strategies prior to December 26, 2006. Again in July 2007 Belsky, Innovative and the Fund represented to the Plaintiff that the Fund was using other investors' funds, Cedarbrook's initial $200,000 investment, would be using future Cedarbrook funds for the

Investment Strategies and that it had substantial success using the Investment Strategies. Innovative, the Fund and Belsky continued making these representations up to August 2, 2007.

38.    The Plaintiff relied on these representations when investing funds in the Fund.

39.    Belsky, Innovative and the Fund made further representations of the continued successful performance of the Fund which Cedarbrook relied on not to exercise its rights to redeem its investment in the Fund.

40.    Belsky, Innovative and the Fund did not use Cedarbrook's funds for the Investment Strategies.

41.    Based on Belsky's, Innovative's and the Fund's conduct it is clear that Innovative and Belsky never had any intention of, using Cedarbrook's funds for the Investment Strategies.

42.    Belsky, Innovative and the Fund knew the representations made to Cedarbrook were false when made or they were reckless in their disregard for the truth when making these representations.

43.    These misrepresentations of material facts were a violation of Section 10b of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder.

44.    As a direct result of Innovative and Belsky's misrepresentations the Plaintiff was damaged in an amount to be determined at trial, but not less than $270,000.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Common Law Fraud against Belsky, Innovative and the Fund)

45.    The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 44 as if fully set forth herein.

46.    Belsky, Innovative and the Fund represented to the Plaintiff that the Fund was using other investors' funds for the Investment Strategies, would also be using Cedarbrook's funds, for the Investment Strategies and that the Fund had substantial success using the

Investment Strategies prior to December 26, 2006. Again in July 2007 Belsky, Innovative and the Fund represented to the Plaintiff that the Fund was using other investors' funds, Cedarbrook's initial $200,000 investment, would be using future Cedarbrook funds for the Investment Strategies and that it had substantial success using the Investment Strategies. Innovative, the Fund and Belsky continued making these representations up to August 2, 2007.

47.     The Plaintiff relied on these representations when investing funds in the Fund.

48.     Belsky, Innovative and the Fund made further representations of the continued successful performance of the Fund which Cedarbrook relied on not to exercise its rights to redeem its investment in the Fund.

49.     Belsky, Innovative and the Fund did not use Cedarbrook's funds for the Investment Strategies.

50.     Based on Belsky's, Innovative's and the Fund's conduct it is clear that Innovative and Belsky never had any intention of, using Cedarbrook's funds for the Investment Strategies.

51.     Belsky, Innovative and the Fund knew the representations made to Cedarbrook were false when made or they were reckless in their disregard for the truth when making these representations.

52.     As a direct result of Innovative and Belsky's misrepresentations the Plaintiff was damaged in an amount to be determined at trial, but not less than $270,000.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(Violation of Sections 6b(a)(2) of the**
**Commodities Exchange Act against Belsky, Innovative and the Fund)**

53.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 52 as if fully set forth herein.

54.     Belsky, Innovative and the Fund represented to the Plaintiff that the Fund was using other investors' funds for the Investment Strategies, would also be using Cedarbrook's funds, for the Investment Strategies and that the Fund had substantial success using the Investment Strategies prior to December 26, 2006.  Again in July 2007 Belsky, Innovative and the Fund represented to the Plaintiff that the Fund was using other investors' funds, Cedarbrook's initial $200,000 investment, would be using future Cedarbrook funds for the Investment Strategies and that it had substantial success using the Investment Strategies. Innovative, the Fund and Belsky continued making these representations up to August 2, 2007.

55.     The Plaintiff relied on these representations when investing funds in the Fund.

56.     Belsky, Innovative and the Fund made further representations of the continued successful performance of the Fund which Cedarbrook relied on not to exercise its rights to redeem its investment in the Fund.

57.     Belsky, Innovative and the Fund did not use Cedarbrook's funds for the Investment Strategies.

58.     Based on Belsky's, Innovative's and the Fund's conduct it is clear that Innovative and Belsky never had any intention of, using Cedarbrook's funds for the Investment Strategies.

59.     Belsky, Innovative and the Fund knew the representations made to Cedarbrook were false when made or they were reckless in their disregard for the truth when making these representations.

60.     These willful misrepresentations of material facts and delivery of false performance records used to defraud Cedarbrook were a violation of violation of Section 6b(a)(2) of the Commodities Exchange Act of 1934.

61.     As a direct result of Belsky, Innovative and the Fund's misrepresentations the Plaintiff was damaged in an amount to be determined at but trial not less than $270,000.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation against Belsky, Innovative and the Fund)

62.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 61 as if fully set forth herein.

63.     Belsky previously had a fiduciary duty to Cedarbrook as a result of Cedarbrook's investment with Belsky's previous fund Cambridge Trading, LLC and therefore Belsky had a special position of trust when discussing investments with Cedarbrook.

64.     Belsky was also a long time personal friend of Spinner.

65.     By virtue of Belsky's position as the sole manager and member of Innovative, Innovative shared this special position of trust with Cedarbrook.

66.     In December 2006 and again in July 2007, Belsky and Innovative represented to the Plaintiff that Innovative was using the funds of other investors for the Investment Strategies and that it had substantial success using the Investment Strategies prior to December 26, 2006.

67.     Based on Cedarbrook's special relationship with Belsky and Innovative, Cedarbrook reasonably relied on these representations when investing the initial $200,000 with the Fund.

68.     Belsky and Innovative had a fiduciary duty to Cedarbrook as a result of Cedarbrook's investment in Innovative.

69.     Between December 26, 2006 and August 2, 2007, Belsky and Innovative represented to Cedarbrook that Innovative was using the funds of other investors, including Cedarbrook's initial $200,000 investment, for the Investment Strategies and that it had substantial success using the Investment Strategies.

70.     Based on Belsky's and Innovative's fiduciary relationships with Cedarbrook, Cedarbrook reasonably relied on these representations when investing an additional $70,000 with Innovative.

71.     Innovative and Belsky had a duty to ensure that their representations were true and accurate.

72.     The representations were false when made.

73.     Innovative and Belsky breached their duty by making the misrepresentations, and were reckless and negligent in their disregard for the truth when making these misrepresentations.

74.     Alternatively, (a) Belsky and Innovative knew the representations they made were being used by the Plaintiff when deciding to make the initial $200,000 and subsequent $70,000 investment with Innovative; (b) that Plaintiff relied on these representations; and (c) Belsky and Innovative made the representations directly to the Plaintiff evincing that they understood that the Plaintiff would rely on their representations.

75.     As a direct result of Innovative and Belsky's negligent misrepresentations the Plaintiff was damaged in an amount to be determined at trial, but not less than $270,000.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Control Person Liability Under Section 20(a) of the Securities Exchange Act of 1934 against Belsky)**

76.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 75 as if fully set forth herein.

77.     At all relevant times Belsky was and is the sole principal of Innovative.

78.     Innovative was the sole manager of the Fund.

79.     At the time of the wrongs herein alleged, Belsky is the person who, directly or indirectly, controlled Innovative and the Fund.

80.     As such, Belsky had and exercised management power over Innovative and the Fund and actively directed, managed, and participated in the fraudulent and manipulative conduct of Innovative and the Fund alleged above.  Accordingly, Belsky is liable as a control person for the primary violations committed by Innovative and the Fund.

81.     As a direct result of Innovative and the Fund's misrepresentations for which Belsky was responsible and in control, the Plaintiff was damaged in an amount to be determined at trial, but not less than $270,000.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Breach of Contract Against Belsky, Innovative and the Fund)

82.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 81 as if fully set forth herein.

83.     Pursuant to an oral contract among Belsky, Innovative and the Fund and Cedarbrook, Cedarbrook invested $300,000 in the Fund that Belsky, Innovative and the Fund was to use for the Investment Strategies.

84.     Cedarbrook fully performed its obligations under the contract by causing $270,000 to be delivered to Innovative and rolling over its $30,000 "profit" from the fund Innovative managed back into the fund innovative managed.

85.     Belsky, Innovative and the Fund did not use the funds for the Investment Strategies.

86.     Belsky, Innovative and the Fund have breached the contract by failing to use the funds for the Investment Strategies.

87.   The implied covenant of good faith and fair dealing required Belsky, Innovative and the Fund to use funds invested by Cedarbrook for the Investment Strategies.

88.   Belsky, Innovative and the Fund breached the implied covenant of good faith and fair dealing by failing to use the $270,000 to invest using the Investment Strategies.

89.   As a direct result of this breach the Plaintiff has been damaged as of the date of this complaint, in an amount not less than $300,000.00.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (Conversion Against Belsky, Innovative and the Fund)

90.   The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 89 as if fully set forth herein.

91.   Plaintiff had the legal rights to the $270,000 funds wired to the Fund.

92.   Belsky, Innovative and the Fund wrongfully converted the funds for their own use.

93.   As a direct result of this conversion the Plaintiff has been damaged as of the date of this complaint, in an amount not less than $270,000.00.

## AS AND FOR A EIGHTH CAUSE OF ACTION
### (Unjust Enrichment ("*Quantum Meruit*") against Belsky, Innovative and the Fund)

94.   The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 93 as if fully set forth herein.

95.   Cedarbrook provided $270,000 to the Fund to be invested on Cedarbrook's behalf.

96.   Belsky, Innovative and the Fund retained the $270,000 for their own purposes and were unjustifiably enriched by $270,000 at the expense of Cedarbrook.

13

97.     Because the $270,000 properly belonged to Cedarbrook it would be unjust an inequitable to allow Belsky, Innovative and the Fund to retain the $270,000.

## AS AND FOR A NINTH CAUSE OF ACTION
### (Constructive Trust against Innovative and Belsky)

98.     The Plaintiff repeats and re-alleges the allegations of Paragraphs 1 through 97 as if fully set forth herein.

99.     Belsky and Innovative had a fiduciary duty to Cedarbrook as a result of Cedarbrook's investment in Innovative.

100.    Belsky and Innovative promised that the funds invested by Cedarbrook in Innovative would be invested by Innovative using the Investment Strategies.

101.    In reliance on Belsky's and Innovative's promise Cedarbrook caused $270,000 to be delivered to Innovative.

102.    Innovative and Belsky retained the $270,000 and there was unjustifiably enriched by $270,000 at the expense of Cedarbrook.

103.    Because the $270,000 properly belonged to Cedarbrook it would be unjust an inequitable to allow Innovative and Belsky to retain the $270,000.

104.    A constructive trust for the $270,000 should be imposed on Belsky and Innovative.

**WHEREFORE**, Plaintiff, Cedarbrook Partners, Ltd., demands judgment against the Defendants as follows:

(a)     Money damages against Innovative and Belsky on the first, second, third, fourth fifth, seventh, eighth  and ninth causes of actions not less than $270,000.00;

(b)     Money damages against Innovative and Belsky on sixth cause of action for not less than $300,000.00;

(c)     Punitive Damages against Innovative and Belsky in an amount to be determined

at trial;

(d)     For such other relief as this Court may determine as fair and just.

Plaintiff hereby demands a trial by jury on all legal claims.


New York, New York
Dated: July 1, 2009


By: _____
Eliezer Drew (ED0625)
Grushko & Mittman, P.C.
Attorneys for Plaintiff
551 Fifth Avenue, Suite 1601
New York, New York 10176
(212) 697-9500

No. _____                                   Issued To _____

# INNOVATIVE CAPITAL FUND, L.L.C.

**A New York Limited Liability Company
Trading Commodity Futures Interests**

**Confidential Private Placement Memorandum**

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS SHOULD BE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

THE COMMODITY FUTURES TRADING COMMISSION HAS NOT PASSED UPON THE MERITS OF PARTICIPATING IN THIS POOL NOR HAS THE COMMISSION PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE DOCUMENT.

Innovative Capital Fund, L.L.C. intends to use this document beginning on January 15, 2008.

Innovative Capital Fund, L.L.C.
Manager: Innovative Capital Management, L.L.C.
4205 Avenue M
Brooklyn, New York 11234
Telephone: (718) 253-9473
Facsimile:  (718) 253-9470

## RISK DISCLOSURE STATEMENT*

YOU SHOULD CAREFULLY CONSIDER WHETHER YOUR FINANCIAL CONDITION PERMITS YOU TO PARTICIPATE IN A COMMODITY POOL. IN SO DOING, YOU SHOULD BE AWARE THAT TRADING COMMODITIES CAN QUICKLY LEAD TO LARGE LOSSES AS WELL AS GAINS. SUCH TRADING LOSSES CAN SHARPLY REDUCE THE NET ASSET VALUE OF THE POOL AND CONSEQUENTLY THE VALUE OF YOUR INTEREST IN THE POOL. IN ADDITION, RESTRICTIONS ON REDEMPTIONS MAY AFFECT YOUR ABILITY TO WITHDRAW YOUR PARTICIPATION IN THE POOL.

FURTHER, COMMODITY POOLS ARE SUBJECT TO SUBSTANTIAL CHARGES FOR MANAGEMENT, ADVISORY AND BROKERAGE FEES. IT MAY BE NECESSARY FOR THOSE POOLS THAT ARE SUBJECT TO THESE CHARGES TO MAKE SUBSTANTIAL TRADING PROFITS TO AVOID DEPLETION OR EXHAUSTION OF THEIR ASSETS. THIS DISCLOSURE DOCUMENT CONTAINS A COMPLETE DESCRIPTION OF EACH EXPENSE TO BE CHARGED THIS POOL AT PAGES 14 THROUGH 15 AND A STATEMENT OF THE PERCENTAGE RETURN NECESSARY TO BREAK EVEN, THAT IS, TO RECOVER THE AMOUNT OF YOUR INITIAL INVESTMENT, AT PAGE 16.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER SIGNIFICANT ASPECTS OF PARTICIPATING IN A COMMODITY POOL. THEREFORE, BEFORE YOU DECIDE TO PARTICIPATE IN THIS COMMODITY POOL, YOU SHOULD CAREFULLY STUDY THIS DISCLOSURE DOCUMENT, INCLUDING A DESCRIPTION OF THE PRINCIPAL RISK FACTORS OF THIS INVESTMENT AT PAGES 17 THROUGH 24.

YOU SHOULD ALSO BE AWARE THAT THIS COMMODITY POOL MAY TRADE FOREIGN FUTURES OR OPTIONS CONTRACTS. TRANSACTIONS ON MARKETS LOCATED OUTSIDE THE UNITED STATES, INCLUDING MARKETS FORMALLY LINKED TO A UNITED STATES MARKET, MAY BE SUBJECT TO REGULATIONS WHICH OFFER DIFFERENT OR DIMINISHED PROTECTION TO THE POOL AND ITS MEMBERS. FURTHER, UNITED STATES REGULATORY AUTHORITIES MAY BE UNABLE TO COMPEL THE ENFORCEMENT OF THE RULES OF REGULATORY AUTHORITIES OR MARKETS IN NON-UNITED STATES JURISDICTIONS WHERE TRANSACTIONS FOR THE POOL MAY BE EFFECTED.

---

*Required by CFTC Regulation §4.24.

ii

# TABLE OF CONTENTS

RISK DISCLOSURE STATEMENT.................................................................................................II

TABLE OF CONTENTS     .........................................................................................................III

GENERAL NOTICES.................................................................................................................IV

I. INNOVATIVE CAPITAL FUND, L.L.C. .................................................................................1

II. THE MANAGER .................................................................................................................4

III. INVESTMENT OBJECTIVES AND TRADING METHODS.................................................10

IV.     USE OF PROCEEDS.......................................................................................................13

V. FEES AND EXPENSES .......................................................................................................14

VI.     RISK FACTORS.............................................................................................................17

VII. CONFLICTS OF INTEREST ...........................................................................................24

VIII. THE BROKER.................................................................................................................25

IX. REDEMPTIONS AND DISTRIBUTIONS ..........................................................................26

X. TAX CONSIDERATIONS....................................................................................................27

XI.     ERISA CONSIDERATIONS ...........................................................................................32

XII. REPORTING.....................................................................................................................34

XIII. SUBSCRIPTION PROCEDURE........................................................................................35

## GENERAL NOTICES

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER OR SOLICITATION TO ANYONE IN ANY JURISDICTION IN THAT SUCH AN OFFER OR SOLICITATION IS NOT AUTHORIZED OR MAY NOT LAWFULLY BE MADE.

THIS INVESTMENT INVOLVES A VERY HIGH DEGREE OF RISK. PARTICIPATION IS SUITABLE ONLY FOR PERSONS WHO ARE WILLING AND HAVE THE FINANCIAL ABILITY TO MAKE AN INVESTMENT WHICH INVOLVES RISK AND MUST BE ABLE TO BEAR THE RISK OF A COMPLETE LOSS OF THE INVESTMENT.

THE INTERESTS OFFERED HEREBY HAVE NOT BEEN REGISTERED OR QUALIFIED UNDER ANY FEDERAL OR STATE SECURITIES LAW AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION AND QUALIFICATION REQUIREMENTS OF THOSE LAWS.

THIS MEMORANDUM DESCRIBES VARIOUS PROVISIONS OF THE FUND'S OPERATING AGREEMENT. THESE DESCRIPTIONS ARE SUMMARIES AND SHOULD NOT BE RELIED UPON WITHOUT A COMPLETE READING OF THE OPERATING AGREEMENT.

PROSPECTIVE MEMBERS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR ANY PRIOR OR SUBSEQUENT COMMUNICATION FROM THE FUND, THE MANAGER OR ANY AFFILIATE, AS LEGAL OR TAX ADVICE.   EACH INVESTOR SHOULD CONSULT WITH HIS COUNSEL, ACCOUNTANT OR BUSINESS ADVISOR AS TO THE LEGAL, TAX AND FINANCIAL MATTERS INVOLVED IN THIS OFFERING.   NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGER.   NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY OFFERS OR SALES HEREUNDER SHALL IMPLY THAT THERE HAS BEEN NO CHANGE SINCE THE DATE OF THE MEMORANDUM IN THE MATTERS DISCLOSED HEREIN OR IN THE EXHIBITS HERETO.

ANY REPRODUCTION OF THIS MEMORANDUM OR ANY DIVULGENCE OF ITS CONTENTS, IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THE MANAGER IS PROHIBITED.

THIS MEMORANDUM CONTAINS CERTAIN FORWARD-LOOKING STATEMENTS OR STATEMENTS WHICH MAY BE DEEMED OR CONSTRUED TO BE FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF THE

PRIVATE SECURITIES LITIGATION REFORM ACT OF 1996 WITH RESPECT TO THE FINANCIAL CONDITION AND BUSINESS OF THE FUND. THE WORDS "ESTIMATE," "PLAN," "INTEND," "EXPECT," "PROPOSED," AND SIMILAR EXPRESSIONS ARE INTENDED TO IDENTIFY FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS INVOLVE AND ARE SUBJECT TO KNOWN AND UNKNOWN RISKS, UNCERTAINTIES AND OTHER FACTORS WHICH COULD CAUSE THE FUND'S ACTUAL RESULTS, PERFORMANCE (FINANCIAL OR OPERATING) OR ACHIEVEMENTS TO DIFFER FROM THE FUTURE RESULTS. INVESTORS ARE CAUTIONED NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS, WHICH SPEAK ONLY AS OF THE DATE HEREOF. THE FUND UNDERTAKES NO OBLIGATION TO PUBLICLY RELEASE ANY REVISIONS TO THESE FORWARD-LOOKING STATEMENTS TO REFLECT EVENTS OF CIRCUMSTANCES AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

## FOR FLORIDA RESIDENTS

THE INTERESTS BEING OFFERED HEREIN HAVE NOT BEEN REGISTERED WITH THE FLORIDA DIVISION OF SECURITIES. IF THE INVESTOR IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT OF 1940 (THE "1940 ACT"), A PENSION OR PROFIT-SHARING TRUST, OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT OF 1933), THE INVESTOR ACKNOWLEDGES THAT ANY SALE OF THE LIMITED LIABILITY COMPANY INTERESTS TO THE INVESTOR IS VOIDABLE BY THE INVESTOR EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY THE INVESTOR TO THE ISSUER, OR AN AGENT OF THE ISSUER, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE INVESTOR, WHICHEVER OCCURS LATER.

# I. INNOVATIVE CAPITAL FUND, L.L.C.

Innovative Capital Fund, L.L.C. (the "Fund") is a commodity pool operated by Innovative Capital Management, L.L.C. ("Manager" or "Innovative"). The Fund trades futures contracts, options on futures contracts, and/or other futures-related interests with the objective of capital appreciation. The Fund is a New York limited liability company organized on August 4, 2005. The Fund is located at 4205 Avenue M, Brooklyn, New York 11234, telephone (718) 253-9473, telefax (718) 253-9470. The Fund intends to use this document beginning on January 15, 2008.

The Fund offers Limited Liability Company Interests ("Interests") pursuant to Rule 506 of Regulation D of The Securities Act of 1933. Investors are required to invest a minimum of $100,000.00 in order to participate in the Fund. This minimum investment requirement may be waived at the Manager's discretion. Prospective Members whose subscriptions are accepted by the Manager will become Members of the Fund. After the commencement of trading, any subscriptions received from investors and approved by the Manager will become Members on the first day of the month following the month in which the funds are received. The offering period for Interests is continuous. The Fund has no maximum aggregate contribution amount. The maximum number of Members will be limited to thirty-five (35), excluding the Manager and those Members considered "accredited investors" as that term is defined in Rule 501 of The Securities Act of 1933.

The Fund's Interests are being offered privately, through the Manager, on a best efforts basis. However, the Manager reserves the right to employ selling agents in future.

In order for an investor to break-even on his investment, the Fund must achieve $7,644.44 in profits per minimum investment of $100,000.00, or 7.64%, based on a minimum aggregate subscription level of $900,000.00, which would represent the approximate Net Asset Value of the Fund in the event that a single new investors invests the minimum subscription amount. (See page 16 for a complete Break Even Analysis).

### Transfer of the Interests is restricted.

There is no public or other market for the Interests nor will such a market develop. The Interests may not be sold, transferred, hypothecated or otherwise disposed of by a Member unless registered under applicable federal and/or state securities laws, or unless, in the opinion of counsel, such registration is not required. Transfer and redemption of Interests are also subject to restrictions contained in the Operating Agreement and herein.

## Limited Liability

An investor in the Fund cannot be individually subjected to margin calls and cannot lose more than the amount of his/her original investment and any profits earned thereon.

## Financial Information

The most recent account statement and the Fund's annual report must accompany delivery of this memorandum as required by Commodity Futures Trading Commission ("CFTC") rules.

## Past Performance

The performance of the Fund is set forth on page 3.  As stated in the Section entitled, "Description of the Trading Program," Innovative currently offers the Call Premium Program.  From February of 2006 through December of 2006, the Fund's trading accounts were traded pursuant to a discontinued program known as the Spread Premium Program.  Since January 1, 2007 through the date of this Memorandum, the Fund's trading accounts have been traded pursuant to Call Premium Program.  Going forward, Innovative intends to trade the Fund's assets pursuant to the Call Premium Program.

**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE
RESULTS
TRADING PERFORMANCE INFORMATION OF
Innovative Capital Fund, L.L.C.
A PRIVATELY OFFERED COMMODITY POOL
Capsule Performance Summary
Period 2/1/06 to 12/31/07**

| | |
|---|---|
| Commodity Pool Operator: | Innovative Capital Management, L.L.C. |
| Commodity Trading Advisor: | Innovative Capital Management, L.L.C. |
| Total Contributions: | $2,070,000 |
| Current Net Asset Value as of December 31, 2007 | $812,096 |
| Inception of Trading: | February 1, 2006 |
| Largest monthly draw-down: | (4.72%) May 2006 |
| Worst peak-to-valley draw-down: | (6.23%) Aug. 2006 – December 2006 |

## MONTHLY AND ANNUAL RATES OF RETURN

| Month | 2007 | 2006 |
|---|---|---|
| January | 5.60% | |
| February | 4.46% | 0.56% |
| March | 0.35% | 1.90% |
| April | -2.20% | 1.35% |
| May | 1.98% | -4.72% |
| June | 4.01% | 8.36% |
| July | 1.68% | 2.14% |
| August | 1.54% | 2.30% |
| September | -2.27% | -1.05% |
| October | 3.30% | -4.66% |
| November | -0.69% | 0.45% |
| December | 2.43% | -1.06% |
| Annual Rate of Return | 21.76% | 5.05% |

Notes:
1. Drawdown means losses experienced by the pool over a specified period.
2. Rate of Return is calculated by dividing the Net Performance by the Adjusted Beginning Net Asset Value (Beginning Asset Value plus time-weighted additions and withdrawals) multiplied by 100.
3. Worst Peak-to-Valley draw-down is the greatest cumulative percentage decline in month-end net asset value of the pool due to losses during a period in which the initial month-end net asset value is not equaled or exceeded by a subsequent month-end net asset value.

---

**Innovative Capital Fund, L.L.C.**

3

## II.  THE MANAGER

### The Manager and Commodity Pool Operator

Innovative Capital Management, L.L.C. ("Innovative"), a New York limited liability company, serves as the Fund's Manager and Commodity Pool Operator ("CPO").   In these capacities, Innovative is responsible for the selection of the Commodity Trading Advisor(s) ("CTA") for the Fund, and provides administrative services to the Fund.  Innovative also acts as the Fund's CTA.  As the Fund's CTA, Innovative directs the Fund's trading account(s).  Innovative has been registered with the CFTC as a CPO and as a CTA since July 1, 2005, and is also a member of the National Futures Association.  The address of the Manager is 4205 Avenue M, Brooklyn, New York 11234, telephone (718) 253-9473, telefax (718) 253-9470.  Yehuda Belsky is the sole principal of Innovative.

### Yehuda Belsky

Mr. Belsky began his trading career in 1995, as an Options Market Maker on the floor of the American Stock Exchange ("AMEX").  In 1997, he founded Libra Capital, LLC, an options trading firm, where he managed equity and index option positions on the AMEX floor and actively traded in the exchange's busiest pits.  While on the floor, Mr. Belsky began to develop the unique, proprietary strategy that is today implemented by Innovative.   His trading style focused on structuring hedged option positions, designed to provide maximum profitability while maintaining low volatility.  In May 2001, Mr. Belsky left the trading floor and continued to use these trading strategies in trading his personal accounts.  He was registered as an Associated Person ("AP") and approved as a principal of a sole proprietor CTA from August 23, 2002 through November 5, 2003.  In 2004, he became associated with Tradewise Associates, L.L.C. ("Tradewise"), a registered CPO, where he continued implementing his trading models. He was registered as an AP and approved as a principal of Tradewise from May 6, 2004 through May 1, 2005.  On July 1, 2005, Mr. Belsky became registered as an AP and approved as a principal of Innovative.  Today, Mr. Belsky, through his extensive experience in and knowledge of derivatives markets, offers investors access to this strategy through the trading programs offered by Innovative.

### Investment in the Fund

Neither the Manager nor its principal will invest in the Fund and thus will not share the Fund's gains or losses on a pro-rata basis.

### Legal Proceedings

Neither the Manager nor Mr. Belsky has been involved in any material

administrative, civil or criminal action, within the five years preceding the date of this disclosure document, or at any time in the past.

## Past Performance

The performance of the Fund is set forth on page 3.

The performance of accounts directed by Innovative is set forth on pages 6 and 7. The performance set forth on page 6 is the performance of accounts traded pursuant Innovative's Call Premium Program, which is the program currently used to trade the Fund's assets. The performance set forth on page 7 is the performance of accounts traded pursuant Innovative's Spread Premium Program, which has been discontinued.

In addition, as stated, Mr. Belsky was previously listed as a principal of Tradewise, a registered CPO. Tradewise operated a commodity pool known as Cambridge Trading Partners, L.L.C. ("CTP"). Tradewise also acted as CTP's CTA, and thus directed CTP's trading accounts. The trading performance of CTP is set forth on page 8. Please note that Mr. Belsky was the sole principal of Tradewise for most of the period represented in this capsule,* and was thus solely responsible for the operations and trading of CTP during that period. Please note that the trading strategies and methods used in trading this account will not be used in trading the Fund's accounts.

In addition, Mr. Belsky has previously directed customer accounts in his capacity as a sole proprietor CTA. The performance of these accounts is set forth on page 9. Please note that the trading strategies and methods used in trading these accounts will not be used in trading the Fund's accounts.

---

* Another principal of Tradewise was approved on March 21, 2005.

---

Innovative Capital Fund, L.L.C.

## PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS
### TRADING PERFORMANCE INFORMATION OF
#### Innovative Capital Management, L.L.C.
#### Capsule Performance Summary
#### Period 1/1/07 to 12/31/07

| | |
|---|---|
| Name of Trader | Innovative Capital Management, L.L.C. |
| Trading Program | Call Premium Program |
| Inception of Trading Pursuant to This Program | January, 2007 |
| Inception of Trading for Clients | December, 2005 |
| Nominal Funding Level of Accounts in all Programs as of December 31, 2007 | $3,777,278 |
| Actual Funding Level of Accounts in all Programs as of December 31, 2007 | $1,614,918 |
| Nominal Funding Level of Accounts in this Program as of December 31, 2007 | $3,777,278 |
| Actual Funding Level of Accounts in this Program as of December 31, 2007 | $1,614,918 |
| Performance Range of Profitable Accounts that have opened and closed since January 2007 | 0 |
| Performance Range of Unprofitable Accounts that have opened and closed since January 2007 | 3 (-2.32% to -7.32%) |
| No. of open Accounts traded pursuant to this Program as of December 31, 2007 | 20 |
| Largest monthly draw-down: | -3.06% September 2007 |
| Worst peak-to-valley draw-down: | -3.06% Aug – Sept. 2007 |

### MONTHLY AND ANNUAL RATES OF RETURN

| Month | 2007 |
|---|---|
| January | 5.79% |
| February | 4.73% |
| March | 0.59% |
| April | -1.40% |
| May | 2.84% |
| June | 4.87% |
| July | 2.49% |
| August | 2.03% |
| September | -3.06% |
| October | 3.31% |
| November | -0.58% |
| December | 2.77% |
| Annual Rate of Return | 26.82% |

Notes:
1. Drawdown means losses experienced by the composite over a specified period.
2. Rate of Return is calculated by dividing the Net Performance by the Adjusted Beginning Net Asset Value (Beginning Asset Value plus time-weighted additions and withdrawals) multiplied by 100.
3. Worst Peak-to-Valley draw-down is the greatest cumulative percentage decline in month-end net asset value of the account due to losses during a period in which the initial month-end net asset value is not equaled or exceeded by a subsequent month-end net asset value.

---

**Innovative Capital Fund, L.L.C.**

**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**
TRADING PERFORMANCE INFORMATION OF
Innovative Capital Management, L.L.C.
**Capsule Performance Summary**
Period 12/1/05 to 12/31/07

| | |
|---|---|
| Name of Trader: | Innovative Capital Management, L.L.C. |
| Trading Program: | Spread Premium Program |
| Inception of Trading Pursuant to This Program: | December, 2005 |
| Inception of Trading for Clients | December, 2005 |
| Nominal Funding Level of Accounts in all Programs as of December 31, 2007 | $3,777,278 |
| Actual Funding Level of Accounts in all Programs as of December 31, 2007 | $1,614,918 |
| Nominal Funding Level of Accounts in this Program as of December 31, 2007 | $0 |
| Actual Funding Level of Accounts in this Program as of December 31, 2007 | $0 |
| Performance Range of Profitable Accounts that have opened and closed since December 2005 | 1 - +7.5% |
| Performance Range of Unprofitable Accounts that have opened and closed since December 2005 | 3 - (-1.22%to -14.30%) |
| No. of open Accounts traded pursuant to this Program as of December 31, 2007 | 0 |
| Largest monthly draw-down: | -6.00 % October 2006 |
| Worst peak-to-valley draw-down: | -8.04% Aug. 2006 – December 2006 |

## MONTHLY AND ANNUAL RATES OF RETURN

| Month | 2007 | 2006 | 2005 |
|---|---|---|---|
| January | 2.91% | 1.97% | |
| February | -0.59% | 1.84% | |
| March | -0.09% | 2.29% | |
| April | * | 1.42% | |
| May | | -4.53% | |
| June | | 8.20% | |
| July | | 2.47% | |
| August | | 2.52% | |
| September | | -1.43% | |
| October | | -6.00% | |
| November | | 0.30% | |
| December | | -0.81% | 0.23% |
| Annual Rate of Return | 2.30% | 7.77% | 0.23% |

Notes:
1. Drawdown means losses experienced by the composite over a specified period.
2. Rate of Return is calculated by dividing the Net Performance by the Adjusted Beginning Net Asset Value (Beginning Asset Value plus time-weighted additions and withdrawals) multiplied by 100.
3. Worst Peak-to-Valley draw-down is the greatest cumulative percentage decline in month-end net asset value of the composite due to losses during a period in which the initial month-end net asset value is not equaled or exceeded by a subsequent month-end net asset value.
* Under the Only Account Traded method of calculating monthly rates of return, accounts that do not trade for the entire month are excluded from the month rate of return calculation. No monthly rate of return was presented because all accounts in the composite closed in the middle of the month.

---

**Innovative Capital Fund, L.L.C.**

**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**
**TRADING PERFORMANCE INFORMATION OF**
**Cambridge Trading Partners, L.L.C.**
**A PRIVATELY OFFERED COMMODITY POOL**
**Capsule Performance Summary**
Period 3/1/04 to 4/30/05

| | |
|---|---|
| Commodity Pool Operator: | Tradewise Associates, L.L.C. |
| Commodity Trading Advisor: | Tradewise Associates, L.L.C. |
| Total Contributions: | $1,572,812 |
| Current Net Asset Value as of December 31, 2007 | $0 |
| Inception of Trading: | March, 2004 |
| Largest monthly draw-down: | (0.64%) August, 2004 |
| Worst peak-to-valley draw-down: | (0.64%) July, 2004 – August, 2004 |

### MONTHLY AND ANNUAL RATES OF RETURN

| Month | 2005 | 2004 |
|---|---|---|
| January | 0.63% | |
| February | 2.13% | |
| March | 0.28% | 2.63% |
| April | 0.88% | 1.37% |
| May | | 1.82% |
| June | | -0.54% |
| July | | 0.95% |
| August | | -0.64% |
| September | | 2.72% |
| October | | -0.34% |
| November | | 0.54% |
| December | | 2.07% |
| Annual Rate of Return | 3.94% | 11.00% |

Notes:

1. Drawdown means losses experienced by the pool over a specified period.
2. Rate of Return is calculated by dividing the Net Performance by the Adjusted Beginning Net Asset Value (Beginning Asset Value plus time-weighted additions and withdrawals) multiplied by 100.
3. Worst Peak-to-Valley draw-down is the greatest cumulative percentage decline in month-end net asset value of the pool due to losses during a period in which the initial month-end net asset value is not equaled or exceeded by a subsequent month-end net asset value.

---

**Innovative Capital Fund, L.L.C.**

**PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**
TRADING PERFORMANCE INFORMATION OF
Yehuda Belsky
**Capsule Performance Summary**
Period 10/1/02 to 10/31/03

| | |
|---|---|
| Name of Trader: | Yehuda Belsky |
| Trading Program: | General Program |
| Inception of Trading Pursuant to This Program: | October, 2002 |
| Inception of Trading for Clients | October, 2002 |
| Actual Funding Level of Accounts as of December 31, 2007 | $1,614,918 |
| No. of Accounts: | 10 |
| No. of losing closed accounts closed since October, 2002 | 10 |
| No. of open Accounts: | 0 |
| Range of Returns Experienced by Losing Accounts | (1.40%) to (20.36%) |
| Largest monthly draw-down: | (15.48%) June, 2003 |
| Worst peak-to-valley draw-down: | (17.33%) March, 2003 – June, 2003 |

## MONTHLY AND ANNUAL RATES OF RETURN

| Month | 2003 | 2002 |
|---|---|---|
| January | -3.12% | |
| February | 3.37% | |
| March | 2.55% | |
| April | -0.57% | |
| May | -1.63% | |
| June | -15.48% | |
| July | 1.01% | |
| August | 0.52% | |
| September | 2.10% | |
| October | -0.30% | ** |
| November | | -0.88% |
| December | | 4.54% |
| Annual Rate of Return | -12.25% | 3.62% |

Notes:
1. Drawdown means losses experienced by one account over a specified period.
2. Rate of Return is calculated by dividing the Net Performance by the Adjusted Beginning Net Asset Value (Beginning Asset Value plus time-weighted additions and withdrawals) multiplied by 100.
3. Worst Peak-to-Valley draw-down is the greatest cumulative percentage decline in month-end net asset value of any one account due to losses during a period in which the initial month-end net asset value is not equaled or exceeded by a subsequent month-end net asset value.

**Under the Only Account Traded method of calculating monthly rates of return, accounts that do not trade for the entire month are excluded from the month rate of return calculation.

---

**Innovative Capital Fund, L.L.C.**

## III.  INVESTMENT OBJECTIVES AND TRADING METHODS

### The Commodity Trading Advisor

In addition to acting as the Fund's CPO, Innovative also acts as the Fund's CTA. As the Fund's CTA, Innovative directs the Fund's trading account(s).  See "The Manager" for a further description of Innovative and its past performance.  The Manager expressly reserves the right to employ additional CTAs at its sole discretion upon 30 days advance written notice to the Members.

### Types of Transactions

The Fund's objective is to achieve appreciation of its assets through speculative trading in futures contracts and options on futures contracts.  However, the Fund may trade or invest in any other type of instrument that is now, or may hereafter be, offered for trading on U.S. or international exchanges or markets (whether regulated, over-the-counter or private) including, but not limited to securities, debt instruments, forward contracts, swaps, physical commodities, and exchange for physicals.  The Fund will not invest in other pools.  The Fund's allowable investments are sometimes referred to as "Investments."

Innovative's objective is to achieve appreciation of the Fund's assets through speculative trading of a wide variety of Investments, including but not limited to foreign and domestic futures contracts, options on futures, forward and spot contracts, and cash commodities. The specific Investments to be traded will be selected from time to time by Innovative on the bases discussed below.  Examples of futures contracts to be traded include, but are not necessarily limited to, metals, interest rates, foreign currencies, agricultural products, energy products, stock indices, and foreign financial instruments.  As set forth more fully below, Innovative intends to concentrate the Fund's trading in options on stock index futures.

Innovative also may engage in transactions in physical commodities, including exchange for physical transactions.  In addition, Innovative may utilize foreign exchange forward and spot contracts on international currencies. Foreign and spot contracts generally provide a liquid market for the purpose of trading foreign currencies.

### Description of the Trading Program

#### In General

Money managers generally rely on either fundamental or technical analysis, or a combination thereof, in making trading decisions and attempting to identify price trends in a commodity interest. "Fundamental analysis" is the consideration of factors

external to the market of a particular instrument. For example, weather and political events which affect the supply and demand of that particular instrument, in order to predict future prices of that instrument. As an example, some of the fundamental factors that affect the supply of commodities (e.g., agricultural products such as corn and soybeans) include the acreage planted, weather during the growing season, harvesting and distribution of the commodity and the previous year's crop carryover. The demand for such commodities is determined in part by domestic consumption and exports and is a product of many factors, including general world economic conditions, exports and the cost of competing products which might be substituted as alternate sources of food or fiber.

Technical analysis is not based on the anticipated supply and demand of the "cash" or "physical" (i.e., actual) commodity; instead, technical analysis is based on the theory that a study of the markets themselves (in particular, of trends of prices established by the markets for various instruments during selected historical periods) provides a means of anticipating prices. Technical analysis of the markets often includes a study of the actual daily, weekly and monthly price fluctuations, as well as volume variations and changes in open interest, utilizing charts and/or computers for analysis of these items and other technical market data.

Both general methodologies have been employed with success by traders and investors in the past, however, neither trading method can be assured of success in a particular interval of time.

## Innovative's Trading Program

Innovative currently offers the Call Premium Program. From February of 2006 through December of 2006, the Fund's trading accounts were traded pursuant to the Spread Premium Program, which has been discontinued. Since January 1, 2007 through the date of this Memorandum, the Fund's trading accounts have been traded pursuant to Call Premium Program. Going forward, Innovative intends to trade the Fund's assets pursuant to the Call Premium Program.

Call Premium Program

The objective of the Call Premium Program ("Program") is to achieve substantial capital appreciation through the trading of futures contracts, options on futures contracts, and/or other futures-related interests.

While a wide variety of different analyses and methodologies are employed by investors, traders, and money-managers worldwide to predict market direction, Innovative, as its name suggests, takes an entirely different approach. Subscribing to an "Efficient Market" theory, Innovative does not engage in the all-too-common business of "knowing", or prognosticating, market direction. Rather, Innovative utilizes a proprietary options trading program in which, using the laws of statistics and

---

Innovative Capital Fund, L.L.C.

probabilities, it attempts to establish "high probability win" positions. Inherent in these positions is the knowledge that there will be instances where a position will result in a loss. This is a wholly acceptable, as well as absorbable inevitability. Innovative views its trading philosophy as similar to that of insurance companies, who write numerous policies, knowing full well that a small percentage of them may (indeed will) have adverse results. To this end, Innovative has in place strict risk-management guidelines, designed to take losing positions "off the table" and let the winning ones thrive.

The market of choice for the Program has been the S&P 500 options and futures contracts. In the Program, Innovative aims to exploit what it considers an inefficiency in market pricing of out-of-the-money call options. As time to expiration nears, a volatility skew, or a relative discounting of implied volatility is attached to call contracts with strike prices far above the current index price.

The Program strategy is to sell specific call options in advance of this skew, attempting to establish high-probability profit opportunities regardless of market direction. Strict risk guidelines are in place to effect stops and/or rolling of positions in the event they are necessary. Due to the distance of strike prices from the current price of the index, along with the anticipation of skew discounting, the majority of positions are expected to reach their profit targets even in rising markets.

As the Program does not trade any put contracts, it maintains little or no downside risk in a declining, or "bearish" market environment. As such, Program's performance is expected to benefit from a potential market crash or catastrophic event of any magnitude. Because of this, the Program may serve as an invaluable hedge for any equity portfolio.

Among the considerations used in both the timing and structure of each position is the monitoring of the various mathematical functions on which option-pricing theory is based, as well as gauging the implied option volatilities of all relevant contracts. Hence, a significantly wider range of expected index movement is built into the Program during times of higher volatility.

The Program typically results in approximately 10% of the total assets of the Fund's accounts will be used to margin positions, although at times this percentage may be as high as 25%. However, this percentage may be substantially more or less at the discretion of Innovative.

The trading program utilized by Innovative is proprietary and confidential. The foregoing description therefore is general by necessity and is not intended to be exhaustive.

---

**Innovative Capital Fund, L.L.C.**

**Use of Leverage**

In addition, Innovative reserves the right to trade the Fund's accounts at nominal levels that are higher or lower than the actual funding level of these accounts. Such increased or decreased use of leverage may increase the risk associated with investing in the Fund. See the Section entitled "Risk Factors" for a brief description of these risks.

---

## IV.   USE OF PROCEEDS

---

Initial subscriptions will be deposited in the Fund's account maintained at Citibank located in Brooklyn, New York.   Interest earned, if any, on these funds will accrue to the benefit of the Members.

The proceeds of this offering are used for speculative trading of futures contracts, options on futures contracts, and/or other futures-related interests. See Section VI for a description of some of the risks involved.

Innovative conducts the trading of the Fund's account(s).  See Section II.

The Fund has executed a Customer Agreement and maintains trading account(s) with MF Global Inc. ("MF Global" or the "Broker"), a registered Futures Commission Merchant. See Section VIII.

On average approximately 10% of the total assets of the Fund are used to margin commodity positions and are therefore segregated pursuant to the Commodity Exchange Act. However, this percentage may be substantially more or less at the discretion of the Manager.

The Fund will hold its assets in two possible ways:

(1)    Virtually all of the Fund's assets are held in cash and/or United States Treasury Bills to margin the trading in the Fund's trading accounts maintained at the Fund's Broker. Any interest earned on these funds accrues to the benefit of the Fund.

(2)    Any remaining Fund assets are held as cash in the Fund's checking account at Citibank located in Brooklyn, New York to pay the expenses of the Fund. Any interest earned on the Fund's assets accrues to the benefit of the Fund.

No loans, whether a direct loan, commercial paper issue, or any other form, will be made to entities affiliated with the Fund or the Manager. The Manager will not commingle the property of any pool that it operates or intends to operate with the property of any other person or entity. Funds held by the Broker are not deemed to be commingled.

---

**Innovative Capital Fund, L.L.C.**

## V. FEES AND EXPENSES

### Offering and Organizational Expenses

The offering and organizational expenses incurred by the Fund in initiating this offering are expected to amount to approximately $9,000. The Manager will pay these expenses, but will be reimbursed by the Fund once the Manager accepts subscriptions totaling at least $1,000,000. Further, once the Fund reaches this subscription level, the offering and organizational expenses will be amortized over a thirty-six (36) month period.

### Brokerage Commissions

The Fund pays brokerage commissions at the rate of no more than $10.50 per "round turn" futures transaction, including brokerage, exchange, NFA and give-up fees.

The Manager does not receive a portion of the commissions charged to the Fund's account(s). Based on Innovative's trading volume, commission charges are expected in the aggregate to be approximately 4.2% of the Fund's Net Asset Value on an annualized basis. Please note that this percentage only represents a good faith estimate, and that it may be higher or lower depending on markets conditions.

### Incentive Allocation

As set forth more fully in the Operating Agreement, a special capital account ("Special Capital Account") is maintained for the Manager ("Special Capital Account"). The Manager's Special Capital Account is credited at each quarter-end with 20% of each Member's share of the Fund's New Trading Profits at of the end of such quarter (the "Incentive Allocation").

New Trading Profits for purposes of calculating the Manager's Incentive Allocation during a calendar quarter shall mean the cumulative profits (over and above the aggregate of previous period profits as of the end of any quarter) during the quarter. New Trading Profits shall include both realized and unrealized profits. New Trading Profits shall include interests received by the Fund on its assets, less accrued fees and commissions (if any). If New Trading Profits for the quarter are negative, it shall constitute a "Carry-forward Loss" for the beginning of the next quarter. To the extent that any funds are withdrawn from Fund's account(s), any loss attributed to the funds shall be deducted from the Carry-forward Loss. No Incentive Allocation shall be payable until future New Trading Profits for the ensuing quarters exceed Carry-forward Loss.

**Management Fee**

The Manager receives a monthly management fee of .167% (2% annually) based on the end Net Asset Value of the Fund. The Net Asset Value of the Fund shall be the difference between the value of the total assets of the Fund and the amount of the total liabilities of the Fund. Unless otherwise specified below, all assets and liabilities are to be determined on the basis of generally accepted accounting principles, consistently applied. For purposes of this calculation, Net Asset Value shall include any unrealized profit or loss on open futures and options positions, less any accrued liabilities (excluding incentive allocations).

**Professional Fees**

The Fund is responsible for payment of its ongoing operating expenses, including but not limited to, ordinary accounting, audit and routine legal expenses, estimated at approximately $13,000.00 per year. In addition, the Fund is responsible for any extraordinary expenses including, but not limited to extraordinary legal expenses. However, no extraordinary expenses are anticipated.

**Selling Commissions**

The Fund's Interests are being offered privately, through the Manager, on a best efforts basis. However, the Manager reserves the right to employ selling agents in the future.

**Total Annual Expenses**

In order for an investor to break-even on his investment, the Fund must achieve $7,644.44 in profits per minimum investment of $100,000.00 per year, or 7.64%, based on a minimum aggregate subscription level of $900,000.00, which would represent the approximate Net Asset Value of the Fund in the event that a single new investors invests the minimum subscription amount. The actual expenses could be significantly higher or lower as a percentage basis of total assets depending on the actual expenses incurred and the total value of the Fund assets. No representation is being made that these expense figures are the maximum possible, however, such figures do represent a good faith estimate by the Manager.

---

| Break-Even Presentation | |
|---|---|
| Minimum Subscription[1] | $100,000 |
| Offering Expenses[2] | $0.00 |
| Operating Expenses[3] | $1,444.44 |
| Brokerage Commission[4] | $4,200.00 |
| Management Fees[5] | $2,000.00 |
| "Break-Even Point" – Amount of Trading Income Necessary for the Value of an Interest at the End of One Year to Equal its Initial Purchase Price Based on a Minimum Aggregate Subscription Amount of $900,000 | $7,644.44 |
| Percentage of Initial Selling Price Per Interest | 7.64% |

---

[1] The minimum initial investment in the Fund is $100,000.

[2] The Fund's organizational and offering expenses will be paid by the Fund if and when it reaches an aggregate subscription level of $1,000,000.

[3] The Fund's Operating Expenses are estimated to be $13,000 per year.

[4] Brokerage commissions resulting from the trading are expected to total approximately $4,200 per year, which represents 400 trades annually per $100,000 in equity. For the purpose of this calculation, it is assumed that the brokerage commissions will be $10.50 per round turn.

[5] The Fund will pay the Manager an annual management fee of 2% based on the Fund's Net Asset Value.

---

Innovative Capital Fund, L.L.C.

## VI.    RISK FACTORS

Participation in the Fund and the purchase of Interests offered hereby is speculative, involves a high degree of risk and is suitable only for persons who are able to assume the risk of losing their entire investment.  Prospective Members should carefully consider the following risks, among others, before participating.

### Futures Markets

#### Prices Are Volatile

The purchase and sale of commodity futures contracts is generally subject to high risk.  Price movements of commodities are caused by many unpredictable factors such as general economic and financial conditions, governmental policies, national and international political and economic events, and technical trading factors.  The foregoing factors may cause commodity prices to be highly volatile which can increase the risk of loss.

#### Lack of Liquidity

Most futures contracts are subject to daily price limitations which means that the exchanges have prohibited the trading of futures contracts if the price fluctuates by a certain amount.  If this occurs, it may be impossible to liquidate a position.  Futures prices have occasionally moved the daily limit for several consecutive days with little or no trading.  Similar occurrences in markets in which the Fund may hold positions at that time could prevent the Fund from promptly liquidating unfavorable positions and subject it to substantial losses.

#### Leverage

A futures position can be established with margin that is typically about 5% of the total value of the futures contract.  Thus, a small movement in the price of the underlying commodity can result in a substantial price movement relative to the margin deposit.  While it is this leverage that Innovative seeks to utilize in generating profits for the Fund, it is also possible that the Fund could lose most or all of its capital because of this leverage combined with price volatility.

#### Speculative Position Limits

The CFTC and the commodity exchanges have established limits on the maximum net long or net short futures positions which any person or group of persons acting together may hold or control. Any commodity accounts owned or managed by a trader or the principals thereof, including the Fund's account must be combined for

---

Innovative Capital Fund, L.L.C.

position limit purposes. The Manager believes that the current limits will not adversely affect the Fund's trading. However, it is possible that trading decisions may have to be modified and positions held by the Fund may have to be liquidated in order to avoid exceeding such limits.

### Counterparty Creditworthiness

The Fund could be unable to recover assets held at the commodity broker, even assets directly traceable to the Fund from the commodity broker in the event of a bankruptcy of the commodity broker. Although Futures Commission Merchants are required to segregate customer funds pursuant to the Commodity Exchange Act, in the unlikely event of the commodity broker's bankruptcy, there is no equivalent of the Securities Investors Protection Corporation insurance as applicable in the case of securities broker dealers' bankruptcies. In the case of any such a bankruptcy, the Fund might recover only a pro rata share of all property available for distribution to all of the commodity broker's customers. Further, there may be instances where there is no property for such a distribution, which would result in a total loss of the Fund's assets.

### Trading On Foreign Exchanges

The Fund's assets may be traded in futures contracts on non-U.S. exchanges, which are not regulated by the CFTC or any other U.S. governmental agency. Due to the absence of a clearinghouse system on certain foreign markets, such markets are significantly more susceptible to disruptions than are U.S. exchanges. Therefore, trading on foreign exchanges potentially is subject to greater risks than trading in the United States.

### Trading of Options

Innovative will engage in the trading of options on futures contracts for the Fund's account(s). Each option on a futures contract or physical commodity is a right, purchased for a certain price, to either buy or sell a futures contract or physical commodity during a certain period of time for a fixed price. Although successful future options trading requires many of the same skills as does successful futures trading, the risks involved are somewhat different. For example, if the Fund buys an option (either to sell or purchase a futures contract or commodity), it will pay a "premium" representing the market value of the option. Unless the price of the futures contract or commodity underlying the options changes and it becomes profitable to exercise or offset the option before it expires, the Fund's account may lose the entire amount of such premium. Conversely, if the Fund sells an option (either to sell or purchase a futures contract or commodity) it will be credited with the premium but will have to deposit margin due to its contingent liability to take or deliver the futures contract or commodity underlying the option in the event the option is exercised. Unlike a buyer of an option, a seller of an option is subject to potentially unlimited losses in the event

---

Innovative Capital Fund, L.L.C.

of unfavorable price movements in the underlying futures contract. The ability to trade in or exercise options may be restricted in the event that trading on United States commodity exchanges is restricted by both the CFTC and such exchanges.

As stated in the Section entitled, "Investment Objectives and Trading Methods," Innovative's program involves selling out-of-the-money call options. The profitability of the program is dependant on the options sold expiring out-of-the-money, which results in an account keeping the premium collected from the sale of the options. Conversely, if the option expires "in-the-money" (i.e., at the time of the expiration of the option, the underlying futures contact is trading above the strike price of a call option or below the strike price of a put option), the option "writer" will generally be assigned a long or short futures position at the strike price where the option was sold. In event of such an occurrence, an account would be subject to unlimited risk of loss.

**Stop Loss Orders**

As stated in the Section entitled, "Investment Objectives and Trading Methods," Innovative may enter stop orders in an attempt to limit losses. However, market conditions may make it impossible to execute a stop order at the stop price or at all. Accordingly, there can be no assurance that the use of stop orders will protect the Fund's accounts from trading losses.

**Trading Disruptions**

Following the terrorist attacks of September 11, 2001, the United States financial markets were closed for several days. In addition, once they were reopened, these markets experienced extreme volatility and a lack of liquidity. There can be no assurance that world events will not cause severe market disruptions in the future. If such market disruptions were to occur again, the Fund's performance could be adversely affected due to the fact that the Fund's assets will be invested in these markets. For instance, the Fund's ability to liquidate positions in order to limit losses could be hindered.

**Concentration Risk**

The Manager intends to trade primarily in options on stock index futures contracts. Because of the Manager's trading will be concentrated in this area, the Manager's trading program is not as diverse as other trading programs, and is thus subject to greater risk of loss in the event that the Manager is unable to trade profitably in these markets.

**Day-Trading**

Although unlikely, Innovative may very actively trade the Fund's account(s),

---

Innovative Capital Fund, L.L.C.

and may engage in "day-trading," which involves initiating and exiting a position on the same trading day.   In addition, several positions may be initiated and exited on the same trading day.  Because the Fund will be charged brokerage commissions each time a trade is placed, the Fund will incur substantial brokerage commissions.   While Innovative believes that the profits resulting from this trading will more than compensate for these increased transactional costs, there is no assurance that this will occur.

### Over-the Counter Transactions

The Fund may engage in over-the-counter transactions ("OTC Transactions"), such as swaps, forward contracts, physical commodities, and exchange-for-physicals. OTC Transactions are not traded on exchanges.  Rather, banks and dealers act as principals in such markets.  Therefore, investors in OTC Transactions are not afforded the regulatory protections of such exchanges or the Commodity Futures Trading Commission.  Neither the CFTC nor any banking authority regulates trading in OTC Transactions, and foreign banks may not be regulated by any United States governmental agency.  There are no limitations on the daily price movements of OTC Transactions.   In addition, speculative position limits are not applicable to OTC Transactions, although the principals with which the Fund may deal in OTC Transactions may limit the position available to the Fund as a consequence of credit considerations. The principals who deal in these markets are not required to continue to make markets. There have been periods during which certain participants in OTC Transactions have refused to quote prices or have quoted prices with an unusually wide spread between the price at which they are prepared to buy and the price at which they are prepared to sell.   The largely unregulated market for such over-the-counter derivatives such as swaps, forward contracts and over-the-counter options has recently come under intense scrutiny by the United States Congress, the Securities and Exchange Commission and the Commodity Futures Trading Commission.  It is possible that the United States government could enact laws that would regulate the use of these products. They could, however, have the effect of making the execution of these transactions by the Fund more or prohibitively expensive.

### Trading On Foreign Exchanges

The Fund may trade in futures contracts on non-U.S. exchanges, which are not regulated by the CFTC or any other U.S. governmental agency.  Due to the absence of a clearinghouse system on certain foreign markets, such markets are significantly more susceptible to disruptions than are U.S. exchanges.   Therefore, trading on foreign exchanges potentially is subject to greater risks than trading in the United States.

---

## The Fund

### Fund Expenses Will Be Substantial

The Fund is obligated to pay brokerage commissions and management fees regardless of whether it realizes profits. Therefore, the Fund will need to make substantial trading profits to avoid depletion of its assets.

### Fund Net Asset Value per Interest May Be Volatile

Given the volatile nature of commodity prices, the value of Members' Interests may also be volatile. Since the Manager requires prior written notice in order to effect a redemption, the value of a Member's Interest on the effective date (last trading day of the month) may substantially differ from its value on the date that the redemption is requested.

### Fund Assets May Not Be Liquid

Innovative trades in futures contracts in which it believes there is sufficient open interest and volume to provide the Fund with liquidity of investment. Although Innovative considers the markets to be sufficiently liquid, there may be times that due to market movement the Fund is unable to liquidate its positions at the desired price levels. Since investors are only able to redeem their Interests on a monthly basis upon written notice to the Manager (See Redemptions and Distributions, Section IX), Interests are not readily liquid. It may not be possible to liquidate the Fund's Investments readily due to market movements. Therefore, the Fund's Interests could decline in value substantially from the date the request for redemption is made and the actual date of the redemption.

### Fund Assets Will Be Leveraged

At times, the Fund's assets will be leveraged because as much as 25% of the value of its assets will be used to margin futures positions. While a high degree of leverage allows Innovative to utilize the Fund's assets to generate profits, it is also possible that the Fund's assets could be lost because of the leverage combined with volatility.

### Use of Leverage

Innovative reserves the right to trade the Fund's accounts at nominal levels that are higher or lower than the actual funding level of these accounts. The use of increased leverage, or up-leveraging, may result in more of the Fund's equity being used to margin positions, and may subject the Fund to more margin calls than if no up-leveraging occurred. In addition, if market conditions so dictate, Innovative may trade the Fund's accounts at a lower nominal level than the actual funding level of these accounts. In the event that this occurs, it may be more difficult for the Fund to achieve its profit goals, and, if the Fund were in a draw-down, it would be more difficult for the

---

**Innovative Capital Fund, L.L.C.**

Fund to make up for trading losses.

### Reliance on the Manager

The Fund intends to rely upon the techniques and strategies developed by Innovative. Members will not participate in the management of the Fund, which will depend solely upon the Manager in making investment and trading decisions. There can be no assurance that the decisions made by the Manager will produce profits (or not generate losses).

### Dependence on the Key Personnel

The Manager's success is largely dependant, if not exclusively, on the skill and investment acumen of Mr. Belsky, the Manager's sole Principal. If Mr. Belsky should die, become incompetent or disabled (i.e., unable, by reason of disease, illness or injury, to perform his functions with respect to the Manager), or otherwise cease to be involved in the affairs of the Manager, the Manager's ability to select attractive investments and manage the Fund would be severely impaired.

### Members Do Not Participate In Management

Members merely participate to the extent of their financial interest in the purchase of Interests in the Fund. Only the Manager will make decisions concerning the administration and/or trading of the Fund's assets subject to the provisions of the Operating Agreement.

### Non-Transferability of Interests

Members may acquire Interests in the Fund only for investment and not for re-sale. There are significant restrictions on the transferability of interests and it is not likely that a public market in the Fund will develop. The Fund interests are considered securities under The Securities Act of 1933 and are being sold pursuant to an exemption from registration. However, this exemption is not available upon a re-sale of the interests. This offering has not been registered under The Securities Act of 1933 nor under the Blue Sky Laws of any state and therefore cannot be sold unless they are subsequently registered under these provisions or if some other exemption from registration is available. However, a Member may withdraw all or a portion of his capital in the Fund monthly, upon fifteen (15) days advanced written notice to the Manager. (See Section IX)

### Taxation as a Corporation

The Fund is formed under the New York Limited Liability Company Act, as amended, and is intended, pursuant to current income tax regulations, to be classified as a partnership and not as an association taxable as a corporation. No ruling will be

---

requested from the Internal Revenue Service regarding such classification. In the event that the Fund was deemed to be an "association" taxable as a corporation, the Members would not be permitted to deduct, on their individual income tax returns, the losses, if any, of the Fund. Additionally, profits would be subject to tax at the normal corporate rate and any distributions of the Fund, other than liquidating distributions would, to the extent of the Fund's current and accumulating earnings and profits, constitute dividends to the Members which are taxable to participants as ordinary income. Accordingly, under such adverse circumstances, there would be a substantial reduction in after tax cash flow to the participants even if the Fund sustains trading profits.

There is also a risk that legislative, administrative or judicial changes could occur under which the Fund would be taxed as a corporation. The U.S. Treasury Department proposed such regulations in January 1977 but they were withdrawn shortly thereafter. Judicial decisions interpreting the present regulations favorable to partnerships have indicated nevertheless that more restrictive regulations would be permissible under the Internal Revenue Code.

### Members' Tax Liability May Exceed Distributions

If the value of a Member's Interest increases during a fiscal year, that increase will be taxable to that Member whether or not any cash has been distributed to the Member. The Manager generally does not intend to make such distributions. As a result, distributions to Members may not equal taxes payable by them with respect to their share of Fund profits, if any. However, Members generally may withdraw all or a portion of their capital upon fifteen (15) days advanced written notice to the Manager.

### Possible Claim against Members

If the assets of the Fund and the Manager are insufficient to discharge the obligations of the Fund, the Fund may have a claim against a Member for the repayment of any cash distribution or redemptions received by the Member, with interest, but only to the extent that such obligations arose before such distribution.

### Conflicts of Interest

The Fund is subject to certain conflicts of interest. See Section VII.

### Disadvantages of Periodic Incentive Fees

The Fund will allocate a portion of its New Trading Profits to the Manager on a quarterly basis. Because of this allocation is made is quarterly, an allocation may be made even though the trading results for a longer time period, such as on a yearly basis, may be unprofitable. Once an incentive allocation is made, the Manager retains it regardless of subsequent performance. However, no new allocations will be made until

---

after any previous losses have been recovered.

**THE FOREGOING LIST OF RISK FACTORS IS NOT A COMPLETE EXPLANATION OF THE RISKS INVOLVED IN THIS OFFERING. PROSPECTIVE INVESTORS SHOULD READ THE ENTIRE MEMORANDUM AND ARE STRONGLY URGED TO CONSULT WITH THEIR PROFESSIONAL TAX ADVISORS BEFORE INVESTING IN THE FUND.**

## VII.  CONFLICTS OF INTEREST

### Selection of the Commodity Trading Advisor

An actual conflict of interest exists in that Innovative, the Fund's Manager, is also the Fund's CTA.  Accordingly, there might not be present the objectivity needed by Innovative in order to evaluate the performance of the Fund and determine if or when a change of the Fund's CTA might be in the best interest of the Fund.  Also, the compensation for Innovative's services is not the result of an arm's length negotiation.  However, Innovative believes that the fees charged to the Fund are comparable to those charged to commodity pools similar to the Fund.

### The Futures Commission Merchant

The Futures Commission Merchant provides clearing and order execution services to customers other than the Fund.  Such customers may compete with the Fund for the same positions, or may be on the other side of trades made on behalf of the Fund.  However, it is not believed that the Futures Commission Merchant's activities with respect to its other customers in this regard will have any material effect on the Fund.

### The Manager May Manage Other Client Accounts or Proprietary Accounts

The Manager and its principal may actively solicit for and manage other client accounts.  In addition, the Manager and its principal may trade for their own accounts and the accounts of their principals and their family members (collectively, "Proprietary Accounts").  Also, the Manager reserves the right to operate other commodity pools and investment funds.  In conducting such activities, the Manager may have conflicts of interest in allocating management time and administrative functions.

Further, the Fund may participate in a "block" order that may include positions for unrelated client accounts of the Manager, as well as their Proprietary Accounts.  In all cases, a systematic, non-preferential method of allocating the fill prices of any block order that results in a split fill will be used.  The Manager will not enter into any trade for Proprietary Accounts where it knowingly favors any account over the Fund's

---

account(s).

The Manager may use the same trading methods and strategies for the Fund's and other clients' or Proprietary Accounts. Therefore, the foregoing accounts may compete for the same position. In addition, no assurance is given that the performance of all such accounts will be identical or even similar because the trades in the various accounts may be of varying duration or even opposite of those held by the Fund account(s). In rendering trading advice to any client, the Manager will not knowingly or deliberately favor any Proprietary Account or other client account over the Fund's account.

The records associated with the Manager's trading of Proprietary Accounts or other client accounts will not be available for inspection by Members.

### Incentive Based Compensation

The Manager's compensation is, in part, based on the performance of the Fund. This may present a conflict of interest in that the Manager may enter riskier trades than normal in order to produce greater profits for the Fund. However, Innovative does not anticipate deviating from the trading strategy explained in Section III herein.

## VIII.  THE BROKER

MF Global Inc. ("MF Global") is registered under the Commodity Exchange Act, as amended, as an FCM and a CPO, and is a member of NFA in such capacities. In addition, MF Global is registered with the Financial Industry Regulatory Authority as a broker-dealer. MF Global was formerly known as Man Financial Inc. ("MFI") until the change of name to MF Global was effected on July 19, 2007. MF Global is a member of all major U.S. futures exchanges and most major U.S. securities exchanges. MF Global's main office is located at 717 Fifth Avenue, 9th Floor, New York, New York 10022-8101. MF Global's telephone number at such location is (212) 589-6200.

At any given time, MF Global is involved in numerous legal actions and administrative proceedings, which in the aggregate, are not, as of the date of this Memorandum, expected to have a material effect upon its condition, financial or otherwise, or to the services it will render to the Fund. There have been no administrative, civil or criminal proceedings pending, on appeal or concluded against MF Global or its principals within the five years preceding the date of this Memorandum that MF Global would deem material for purposes of Part 4 of the Regulations of the CFTC, except as follows:

In May, 2006, MFI was sued by the Receiver for Philadelphia Alternate Asset Fund ("PAAF") and associated entities for common law negligence, common law fraud,

violations of the Commodity Exchange Act and RICO violations (the "Litigation"). In December, 2007, without admitting any liability of any party to the Litigation to any other party to the Litigation, the Litigation was settled with MFI agreeing to pay $69 million, plus $6 million of legal expenses, to the Receiver, in exchange for releases from all applicable parties and the dismissal of the Litigation with prejudice. In a related action, MFI settled a CFTC administrative proceeding (In the Matter of MF Global, f/k/a Man Financial Inc., and Thomas Gilmartin) brought by the CFTC against MFI and one of its employees for failure to supervise and recordkeeping violations. Without admitting or denying the allegations, MFI agreed to pay a civil monetary penalty of $2 million and accepted a cease and desist order. MFI has informed the Manager, the Trading Advisor and the Placement Agent that the settlements referenced above will not materially affect MF Global or its ability to perform as a clearing broker.

On February 20, 2007, MFI also settled a CFTC administrative proceeding (In the Mater of Steven M. Camp and Man Financial Inc., CFTC Docket No. 07-04) in which MFI was alleged to have failed to supervise one of its former AP who was charged with fraudulently soliciting customers to open accounts at MFI. The CFTC alleged that the former AP misrepresented the profitability of a web-based trading system and of a purported trading system to be traded by a commodity trading advisor. Without admitting or denying the allegation, MFI agreed to pay restitution to customers amounting to $196,900.44 and a civil monetary penalty of $120,000. MFI also agreed to a cease and desist order and to strengthen its supervisory system for overseeing sales solicitations by employees in connection with accounts to be traded under letters of direction in favor of third party system providers.

MF Global acts only as clearing broker for the futures accounts to be traded pursuant to this Memorandum and as such is paid commissions for executing and clearing trades. MF Global has not passed upon the adequacy or accuracy of this Memorandum and will not act in any supervisory capacity with respect to the Manager of the commodity pool, as the case may be, nor participate in the management of the Manager or of the commodity pool. Therefore, prospective investors should not rely on MF Global in deciding whether or not to participate in the commodity pool.

## IX. REDEMPTIONS AND DISTRIBUTIONS

### Redemptions

Members may withdraw any or all of their Capital Accounts - as of the last trading day of any month (the "effective date") - based upon the value of their respective Interests on the effective date. Members must give written notice to the Manager fifteen (15) days prior to the month's end in order to make such a withdrawal. Therefore, the value of an Interest on the effective date (last trading day of the month) may substantially differ from its value on the date that the redemption is requested.

---

The value of a Member's Capital Account is defined in the Operating Agreement as the Member's initial capital contribution plus his pro-rata share of the Fund's trading profits minus his pro-rata share of the Fund's trading losses and expenses (including accrued incentive allocations and commissions), all calculated in accordance with Generally Accepted Accounting Principles. If there is a cumulative loss at the time of a redemption, such losses will be proportionately reduced against the Member's capital account.   The Fund will pay the Member within 60 days of the month's end in which such request was made, except that payment may be deferred if sufficient funds are not available because of a market disruption or other extraordinary circumstance.

The written request for redemption must be in a form approved by the Manager. There will be no fee for redeeming Interests in the Fund.

### Mandatory Redemption

If the Manager in its discretion deems it to be in the best interest of the Fund to do so, the Manager may require any Member to retire from the Fund at any time by giving the Member written notice by U.S. mail and promptly distributing payment of the Member 's Interest less accrued expenses.

### Distributions

The Manager does not anticipate a distribution of profits, if any, to Members. Rather, the Manager anticipates that to the extent that the Fund trading generates profits, these profits will remain Fund assets and will be used to further finance the Fund's Investments.

## X.  TAX CONSIDERATIONS

**Note:  Prospective Members should consult their own advisors regarding all the tax considerations relevant to investing in the Fund.**

### Introduction

This section summarizes some of the federal income tax consequences to Members owning Interests in the Fund. This summary does not address the tax implications of owning an Interest in the Fund by corporations, partnerships, trusts and other non-individuals. This summary is also not a substitute for tax advice, particularly since certain of the tax consequences of owning an Interest in the Fund may not be the same for all taxpayers.

## Partnership Status

Under the "check the box" regulations that became effective January 1, 1997, the Fund, as a limited liability company, will be treated for federal income tax purposes as a partnership. Thus, each item of Fund income, gain, loss, deduction and credit should flow through to the Fund's investors for federal income tax purposes. In addition, the Fund does not expect to be treated as a "Publicly Traded Partnership" for federal income tax purposes.

## Fund Taxation

For federal income tax purposes, an entity such as the Fund is not a taxable entity but rather a conduit through which taxable income or deductions are passed to the Members. Thus, the Fund's form of organization allows the Members rather than the Fund to receive any tax credits and deductions from the operations to be engaged in by the Fund. The Members will be subject to tax on income of the Fund, but no additional tax will result to the Fund. Each Member, in computing his own federal income tax liability for a taxable year, will be required to take into account his share of all items of Fund income, gain, loss, deduction or credit for the taxable year to the Fund regardless of whether such Member has received any distributions from the Fund.

A Member's share of such items for federal income tax purposes generally will be determined by the Operating Agreement on a pro-rata basis taking into account each Member's capital account and for Members who have redeemed Interests during the fiscal year, the number of days during the fiscal year that Interests were owned by such Members on a weighted average basis. A Member's distributive share of Fund loss (including capital loss) will be deductible on his personal income tax return only to the extent of his adjusted basis in his Fund interest. However, because of the limitations imposed upon the deductibility of capital losses by the IRS, a Member's pro rata share of the Fund's net capital losses, if any, will not materially reduce his federal income tax on his ordinary income.

## Treatment of Redemptions

If the cash received from the Fund by a Member as a result of the redemption of any or all of his Interest by the Fund during any calendar year exceeds his share of the Fund's taxable income for that year, the excess will constitute a return of capital to the Member for federal income tax purposes. It will thereby reduce, but not below zero, the tax basis of his interest in the Fund. If these redemptions exceed the Member's adjusted tax basis in his Interest, the excess will be taxable to him as though it was a gain from a sale of the Interest.

A loss will be recognized upon a withdrawal of capital only if, following the withdrawal of all of the Member's capital, the Member has any tax basis in his interest

---

**Innovative Capital Fund, L.L.C.**

remaining.  He will then recognize loss to the extent of the remaining basis.

## Gains and Losses from Futures Trades

The net unrealized gain or loss from open positions in Section 1256 contracts held as capital assets at the end of the Fund's taxable year generally will be "marked-to-market", i.e. treated as if such gain or loss were realized on such date.  Section 1256 contracts include futures contracts which are traded on a National Securities Exchange that is registered with the SEC, a Domestic Board of Trade designated as a contract market by the CFTC, or any other Board of Trade, Exchange or other market designated by the Secretary of the Treasury in which contracts are "marked-to-market" to determine the amount of margin which must be deposited or may be withdrawn.

The amount of unrealized gain or loss under Section 1256 contracts generally will be determined by reference to the prices quoted for the contract on the Exchange on the last day of the Fund's taxable year.  Thus, for tax purposes, Section 1256 contracts will be treated as having been sold for their fair market value on the last day of the year, and any gain or loss will be taken into account for that year.  The Manager anticipates that the Fund will trade exclusively in Section 1256 contracts.

Any gain or loss recognized by the Fund under Section 1256 contracts will be deemed to consist of 60% long term capital gain or loss and 40% short term capital gain or loss.

## Limited Deduction for Certain Expenses

Under current law, individual taxpayers who itemize deductions are permitted to deduct expenses of producing income, including investment advisory fees, when computing taxable income. Such expenses are to be aggregated with other expenses of producing income and the aggregate amount of such expenses are deductible only to the extent that such amount exceeds 2% of a taxpayer's adjusted gross income.  It is unclear whether the Fund's expenses will be subject to the 2% floor.  The Fund's principal expenses that might be subject to the 2% floor are expected to be the advisory fees paid to Innovative.  The IRS might contend that the portion of the brokerage commissions and, to the extent applicable, the fees received by the Manager would be re-characterized as fees paid to the Manager in exchange for services.  If such a contention were sustained, each Member's pro rate share of the amounts re-characterized would be deductible only to the extent that such Member's aggregate investment expenses exceed 2% of such Member's adjusted gross income.  In addition, each Member's distributive share of income from the Fund would be increased (solely for tax purposes) by such Member's pro rata share of the amounts re-characterized.  The Manager intends to report the management and advisory fees, if any, as not subject to the 2% limitation.

---

Innovative Capital Fund, L.L.C.

## Limitations On Deductibility Of Passive Loss

The tax code generally provides that losses from a passive activity are disallowed to the extent that losses exceed income from all passive activities. A passive activity is a trade or business in which the taxpayer does not materially participate, unless otherwise provided in the regulations. Therefore, if the Fund is considered to be engaged in a trade or business for federal income tax purposes, the ownership of Interests would constitute a "passive activity" with the result that net losses from Fund operations (including net capital losses) would not be deductible in computing the taxable income of a Member except against certain income from the Fund or other "passive activities" or until disposition of the Member's interest in the Fund. Temporary treasury regulations issued in February of 1988, provide that the trading in personal property such as securities and commodities will not be treated as a passive activity. Accordingly, a Member's distributive share of items of Fund income, gain, deduction or loss will not be treated as passive income or loss, and Fund gains allocable to Members will not be available to offset passive losses from sources outside the Fund. Fund capital gain allocable to Members will be treated as portfolio income and will be available to offset capital losses with respect to "portfolio" investments.

The excess of capital losses over capital gains is deductible by an individual against ordinary income on a dollar for dollar basis, subject to an annual limitation of $3,000. Excess capital losses may be carried forward or backward, if elected.

## Exempt Organizations

An Exempt Organization (including an IRA qualified under Section 408 of the Code and a trust forming part of a Keogh, profit-sharing or pension plan qualified under Section 401 of the Code or an organization described in Section 501(c) or (d) of the Code) is not subject to Federal income tax except to the extent that it has "unrelated business taxable income." Unrelated business taxable income includes the gross income derived by an exempt organization from any unrelated trade or business regularly carried on by it or by a partnership of which it is a member. Interest and gains and losses from the sale, exchange or other disposition of property, unless properly includable in inventory or held primarily for sale in the ordinary course of a trade or business, are excluded from the computation of unrelated business taxable income. In computing the unrelated taxable income of an Exempt Organization, deductions are allowed for expenses, depreciation and similar items which are directly connected to carrying on the unrelated business. In addition, the Code provides a $1,000 annual specific deduction, except for computation of net operating losses.

Notwithstanding the exclusion of any specific type of income from unrelated business income, an Exempt Organization will be taxed on its distributive share of any income from the Fund to the extent that either the Exempt Organization's investment in the Fund, or the Fund's investment in the asset from which such income is derived, is

---

debt-financed. Such an investment will be debt-financed if the investment is made with the use of borrowed funds, or if it is reasonably foreseeable that as a result of such investment, future borrowings would be necessary to meet anticipated cash requirements. The Fund generally does not expect to acquire property subject to indebtedness which would give rise to unrelated debt-financed income.

A "publicly traded partnership" that is not subject to taxation as a corporation because it meets the 90% passive income test described above nevertheless will generate unrelated business taxable income to an Exempt Organization even though the Partnership would not otherwise have such income. The Fund should qualify for a least one of the exemptions from publicly traded status as long as the Fund has 500 or fewer Members. Accordingly, the Fund should not have any significant amount of unrelated business taxable income.

### Tax Returns and Information

The Fund will file an information tax return using the accrual method of accounting. Within 90 days after the close of the Fund's taxable year, the Fund will furnish each Member (and any assignee of an interest of any Member) copies of (a) the Fund's schedule K-1 indicating the Member's distributive share of tax items and (b) such additional information as is reasonably necessary to permit the Members to prepare their own federal and state tax returns. The Fund's tax return will be prepared by an independent certified public accountant selected by the Manager.

### The Fund's Taxable Year

The Fund will use the calendar year as its taxable year.

### Tax Audits

Adjustments in tax liabilities with respect to Fund items are made at the Fund level. The Manager will represent the Fund during any audit and in any dispute with the IRS. The Manager will inform each Member of a commencement of an audit of the Fund. In general, the Manager may enter into a settlement agreement with the IRS on behalf of, and binding upon, the Members. However, prior to settlement a Member may file a statement with the IRS stating that the Manager does not have the authority to settle on its behalf.

The period for assessing a deficiency against a Member in a Fund with respect to a Fund item is the latter of three years after the Fund files its return or, if the name and address of the Member does not appear on the Fund return, one year after the IRS is furnished with the name and address of the Member. In addition, the Manager may consent on behalf of the Fund to the extension of the period for assessing a deficiency with respect to a Fund item. As a result, a Member's federal income may be subject to examination and adjustment by the IRS for a Fund item more than three years after it has

---

Innovative Capital Fund, L.L.C.

been filed.

**State and Local Taxes**

In addition to the federal income tax consequences described above, the Fund and the Members may be subject to various state and local taxes. A Member's distributive share of the realized profits of the Fund may be required to be included in determining his reportable income for state or local tax purposes.

THE FOREGOING STATEMENTS REGARDING FEDERAL INCOME TAX CONSEQUENCES TO THE MEMBERS ARE BASED UPON THE EXISTING PROVISIONS OF THE INTERNAL REVENUE CODE AND THE EXISTING ADMINISTRATIVE AND JUDICIAL INTERPRETATIONS THEREUNDER. IT IS EMPHASIZED THAT NO ASSURANCE CAN BE GIVEN THAT LEGISLATIVE, ADMINISTRATIVE OR JUDICIAL CHANGES WILL NOT OCCUR WHICH MODIFY SUCH STATEMENTS. THIS SECTION IS NOT INTENDED AS A SUBSTITUTE FOR CAREFUL TAX PLANNING. ACCORDINGLY, PROSPECTIVE MEMBERS IN THE FUND ARE URGED TO CONSULT THEIR TAX ADVISORS WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATION UNDER FEDERAL LAW AND THE PROVISIONS OF APPLICABLE STATE AND LOCAL LAW BEFORE SUBSCRIBING FOR INTERESTS.

## XI.   ERISA CONSIDERATIONS

The Manager will, subject to the limitation below, accept subscriptions from IRAs and Keogh Plans which cover only self-employed persons and their spouses and no employees, from employee benefit plans covering only the sole owner of a business and/or his or her spouse (collectively, "Individual Retirement Funds"), from Employee Benefit Plans ("Plans") subject to Title I of ERISA (defined below), and from government plans, church plans, and foreign employee benefit plans, etc. (collectively, "Non-ERISA Plans"). Section 404(a)(1) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and the regulations promulgated thereunder by the United States Department of Labor (the "DOL") provide as a general rule that a fiduciary with respect to a Plan must discharge his duties with respect to the Plan in a prudent manner and must consider several factors in determining whether to enter into an investment or engage in an investment course of action. If a fiduciary with respect to any such Plan acts imprudently with regard to selecting an investment or an investment course of action for such Plan, the fiduciary may be held personally liable for losses incurred by the Plan as a result of such imprudence. Among the factors that should be considered are (i) the diversification and liquidity of the Plan's portfolio; (ii) the potential return on the proposed investment and the effect on that return of any portion of the Fund's income which constitutes "unrelated business taxable income" (see "Tax Considerations–Taxation of Tax Exempt Members"); and (iii) the place the proposed

---

investment would occupy in the Plan's portfolio taken as a whole.

The acceptance of a subscription by the Manager from an Individual Retirement Fund or a Plan does not constitute a representation or judgment by the Manager that an investment in the Fund is an appropriate investment for that entity or that such an investment meets the legal requirements applicable to such entity. Those considering the purchase of Interests on behalf of a Plan or an Individual Retirement Fund first must ensure that the Plan or Individual Retirement Fund has been properly established in accordance with the Code and the rules, regulations and existing interpretations thereunder and that the Plan or Individual Retirement Fund is adequately funded. After a Plan or Individual Retirement Fund has been properly established and adequately funded and if the purchase of Interests is not prohibited under the governing documents of the Plan or Individual Retirement Fund, the trustee or custodian of the Plan or Individual Retirement Fund who decides to do so or who is instructed to do so can subscribe for Interests.

Depending upon the percentage of Interests purchased by Plans, Individual Retirement Funds and Non-ERISA Plans relative to purchases by other permitted investors, the underlying assets of the Fund may be considered to be assets of the Plans investing in the Fund. Under a regulation of the DOL, when a Plan acquires an equity interest in an entity such as the Fund, which interest is not a publicly offered security, as is the case with the Interests, the underlying assets of the Fund will not be deemed Plan assets, if, in the aggregate, less than 25% of the Interests (excluding any Interests issued to the Manager or its affiliates) are held by "benefit plan investors" (which includes Plans, Individual Retirement Funds and Non-ERISA Plans). If such benefit plan investors were to own 25% or more of the Interests, the underlying assets of the Fund would constitute Plan assets. The DOL regulation provides that the 25% ownership test is applied only when a person acquires Interests. However, an advisory opinion of the DOL takes the position that a redemption of an equity interest by an investor also constitutes the acquisition of an equity interest by the remaining investors (through an increase in their percentage ownership of the remaining Interests), thus triggering an application of the 25% test at the time of the redemption. Accordingly, in no event will the Manager accept a subscription from any prospective investor if, after accepting such subscription, an aggregate of 25% or more of the equity interests (without giving effect to the equity interests held by the Manager or any of its affiliates) in the Fund would be held by Plans, Individual Retirement Funds and non-ERISA Plans (the "25% Ownership Limitation"). Moreover, if, following any withdrawal of Interests by Members, 25% or more of the remaining Interests in the Fund (excluding Interests issued to the Manager or its affiliates) would be held by Plans, Individual Retirement Funds, and non-ERISA Plans, the Manager intends to exercise its mandatory withdrawal right to cause the withdrawal of a sufficient number of Interests held by Plans, Individual Retirement Funds and non-ERISA Plans to bring the Fund into compliance with the 25% Ownership Limitation.

---

Innovative Capital Fund, L.L.C.

Certain prospective Plan and Individual Retirement Fund investors may currently maintain relationships with the Manager or its affiliates under which the Manager or its affiliates provide investment advisory and/or management services to such entity. These relationships may cause the Manager or its affiliates to be deemed to be fiduciaries with respect to such Plan or Individual Retirement Fund. The DOL has issued regulations defining the term "fiduciary" which provide that an investment adviser who renders investment advice to a Plan or Individual Retirement Fund for a fee pursuant to an understanding that such advice will serve as a primary basis for such entity's investment decisions or who has discretionary control over the assets of such entity will be deemed a fiduciary, but only with respect to that portion of the entity's assets with respect to which the investment adviser renders such advice or has such discretion.

Under ERISA, investment in the Fund by a Plan or Individual Retirement Fund for which the Manager or any of its affiliates provide investment advisory and/or management services could possibly be interpreted to constitute a prohibited use of the plan assets of such entity because it has the effect of benefiting one or more parties in interest. The Manager has determined that neither it nor any affiliate will recommend investment of any Plan or Individual Retirement Fund assets in Interests with respect to which assets the Manager or any affiliate may be a fiduciary, nor will the Manager or any affiliate allocate any such assets over which they have discretionary control to the Fund. The Manager believes that with respect to the assets of a Plan or Individual Retirement Fund, the Manager or any affiliate has a non-fiduciary, party in interest relationship, any investment in the Fund which is undertaken on behalf of such Plan or Individual Retirement Fund by an independent plan fiduciary who possesses the requisite experience and acumen to understand the operation of the Fund and who determines that the investment is appropriate and in the best interests of the Plan or Individual Retirement Fund and which is made under arm's length conditions should not be viewed as a prohibited transaction.

**FIDUCIARIES OF EMPLOYEE BENEFIT PLAN INVESTORS THAT ARE PROSPECTIVE MEMBERS SHOULD CONSULT WITH THEIR OWN LEGAL COUNSEL CONCERNING THE CONSEQUENCES UNDER ERISA OF AN INVESTMENT IN THE FUND, INCLUDING ALL COMPENSATION ARRANGEMENTS.**

## XII. REPORTING

The Manager will provide to all Members a statement of account on a monthly basis. The Manager will also provide to all Members a certified annual report of financial condition pursuant to CFTC Reg. 4.22(c). Additionally, the Manager will provide the Net Asset Value of the Fund or Interests thereof at any time upon request

---

by a Member.

## XIII. SUBSCRIPTION PROCEDURE

Each prospective Member must complete and deliver to the Manager a complete Subscription Application, which includes all of the following:

a. An originally executed Operating Agreement (attached as Exhibit A to this Memorandum);

b. An originally executed Subscription Application and Agreement and Limited Power of Attorney (attached to this Memorandum as Exhibit B);

c. A completed and executed Confidential Purchaser Questionnaire or Purchaser Representative Questionnaire (attached as Exhibit C to this Memorandum), as appropriate;

d. An executed Acknowledgement of Receipt of Confidential Private Placement Memorandum (attached as Exhibit D to this Memorandum);

e. A check made payable to "Innovative Capital Fund, L.L.C." or a wire transfer to the Fund's bank account maintained at Citibank located in Brooklyn, New York.

The Manager may, in its sole discretion, reject any Subscription Application for any reason.

**EXHIBIT A**

## INNOVATIVE CAPITAL FUND, L.L.C.

## OPERATING AGREEMENT

THIS OPERATING AGREEMENT made and entered into this _____ day of _____, 20__, by and between Innovative Capital Management, L.L.C., a New York limited liability company, (the "Manager") and other parties who shall execute this agreement, whether in counterpart, by separate instrument or otherwise, as Members (who are hereinafter referred to as "Members").

## W I T N E S S E T H

WHEREAS, the parties hereto desire to form a Company for the purpose of speculative trading in commodity futures contracts and options thereon.

NOW, THEREFORE, the parties hereto agree as follows:

1. **Formation and Name.**

The parties hereto hereby form a Company. The name of the Company is Innovative Capital Fund, L.L.C. (the "Company"). The Manager has executed and filed with the Office of the Department of State of New York the Articles of Organization and shall execute, file, record and publish as appropriate such amendments, assumed name certificates and other documents as necessary or advisable as determined by the Manager. Each Member agrees to furnish the Manager with a limited power of attorney which may be filed with the Articles of Organization and any amendments thereto and such additional information as is required to complete such documents and shall execute and cooperate in the filing, recording or publishing of such documents at the request of the Manager.

2. **Principal Office.**

The principal office of the Company shall be 4205 Avenue M, Brooklyn, New York 11234 or such other place as the Manager may designate from time to time.

3. **Business.**

The Company's business and purpose is to achieve substantial appreciation of its assets through aggressive trading in commodity futures contracts and options thereon. However, there are no restrictions on the Company's allowable investments. The Company may trade, buy, sell, and otherwise acquire, hold, dispose of, and deal (on margin or otherwise) in any investment opportunities available, including, without limitation, any instrument offered for trading or investment on U.S. or international

exchanges or markets (whether regulated, over-the-counter or private), securities, debt instruments, forward contracts, options, swaps, physical commodities, and exchange for physicals. The Company's allowable investments are collectively referred to as "Investments" throughout this Agreement. The Company may provide all necessary and appropriate financial and administrative services and support for such activities and do all other things necessary or convenient to further the foregoing purposes. In addition, the Company may carry out any and all other activities as permitted under the laws of the State of New York.

4.      **Term, Dissolution and Fiscal Year.**

(a)      **Term.**  The Manager has filed the Articles of Organization with the New York Department of State. The Company shall continue for a period ending on the first day to occur of the following:

(i)      Withdrawal or insolvency of the Manager unless a new Manager shall be substituted pursuant to Section 14(c) hereof;

(ii)      Failure of the Company to obtain US$250,000 in subscription funds within 90 days of the commencement of the offering, unless the Manager extends this period an additional 90 days; or

(iii)      Any event which shall make unlawful the continued existence of the Company.

(b)      **Dissolution.**  Upon the first to occur of the events in Section (a) above, the Company shall terminate and be dissolved. Each Member shall share in the assets of the Company, after the payment of creditors, pro rata in accordance with their respective capital accounts, less any amount owing by such Member to the Company.

(c)      **Fiscal Year.**  The fiscal year of the Company shall begin on January 1 of each year and end on the following December 31; provided, however, that if such fiscal year is disapproved by the Internal Revenue Service the fiscal year shall be as otherwise approved by the Manager and the Internal Revenue Service.

5.      **Management of the Company.**

The Manager, to the exclusion of all Members, shall conduct and manage the business of the Company including, without limitation, the selection of trading advisors employed to invest the assets of the Company. No Member shall be entitled to any salary, draw or other compensation from the Company on account of any investment in the Company. The Manager shall have sole discretion in determining what distributions of profits and income, if any, shall be made to the Members, shall execute various documents on behalf of the Company and the Members and supervise the liquidation of the Company if an event causing termination of the Company occurs.

The Manager may in furtherance of the business of the Company cause the Company to buy, sell, hold, otherwise acquire or dispose of commodity futures contracts or options on commodity futures contracts. Additionally, the Manager may cause the Company to buy, sell, hold, or otherwise acquire or dispose of Investments, as defined herein.

The Manager will have sole discretion with regard to the appointment or employment of all persons or entities providing services to the Company including, but not limited to, trading advisors, brokers and accountants and may employ any such persons or entities on behalf of the Company without notice to the Members.

The Manager may engage in other business activities and shall not be required to refrain from any other activity or disgorge any profits from any such activity, whether as Manager of additional companies for investment in commodity futures contracts or options on commodity futures contracts or otherwise.

The Manager shall have a fiduciary responsibility to the Company with respect to the safekeeping and use of all funds and assets of the Company, and shall not employ or permit others to employ such funds and assets in any manner except for the exclusive benefit of the Company. The Company shall keep and retain such books and records relating to the business of the Company as it deems necessary or advisable, or as required by the Securities Act of 1933, as amended or the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Securities and Exchange Commission ("SEC"), at the principal office of the Company, or such other offices as the Manager deems advisable. Such books and records shall be retained by the Company for not less than six years. The Members shall be given reasonable access to the books and records of the Company.

No person dealing with the Manager shall be required to determine its authority to make any undertaking on behalf of the Company nor to determine any fact or circumstance bearing upon the existence of its authority.

The Company shall make no loans to Members. Assets of the Company will not be commingled with assets of any other entity. Deposits of assets with a commodity or securities broker shall not constitute commingling.

6.   **Capital Contributions and Company Interests.**

(a)   **Initial Capital Contributions.**   Ownership in the Company shall be evidenced by Interests. The Manager will issue Interests to persons desiring to become Members whose subscriptions have been accepted by the Manager. Prior to commencement of trading, each Member will be required to make a minimum investment of US$100,000 in the Company. The Manager reserves the right to waive this

---

minimum investment requirement. Additionally, the amounts invested by the Members are strictly confidential.

After the Company begins operations, an investor will become a Member in the Company on the first day of the month following receipt by the Company of the investor's capital contribution and acceptance by the Manager of such investor's executed Operating Agreement, Subscription Agreement/ Power of Attorney, Purchaser Questionnaire, and Acknowledgement of Receipt of Confidential Private Placement Memorandum and any other documents required by the Manager (collectively, the "subscription documents") no less than five days preceding the first day of the month. The Manager may contribute funds to the Company under the same terms and conditions.

(b)     **Additional Capital Contributions.** A Member may, as of the first day of any month, contribute additional funds to the Company provided such contribution is received at least 5 days prior to this effective date. This 5 day period may be waived at the discretion of the Manager. As of the effective date, the Manager will revise the contributing Member's capital account to reflect such contribution. In determining the value of capital accounts of the Members, the value of each Member's Interest shall be determined as of the close of business on the last day of the month immediately preceding the effective date of the capital contribution. The Manager may contribute additional funds to the Company under the same terms and conditions.

7.     **Allocation of Profits and Losses.**

(a)     **Capital Accounts.** A capital account shall be established for each Member. The initial balance of a Member's capital account shall be his capital contribution at the time of his admission to the Membership.

The term "Capital Account " of any Member is defined to mean the Member's initial capital contribution plus his pro-rata share of the Company's trading profits minus his pro-rata share of the Company's trading losses and expenses (including accrued incentive allocations and commissions), all calculated in accordance with Generally Accepted Accounting Principles.

(b)     **Special Capital Account.** A special capital account shall be maintained for the Manager ("Special Capital Account"). Unlike the Members, the Manager will not be required to provide a Capital Contribution in order to maintain the Special Capital Account, nor will the Manager's Special Capital Account be debited for Net Losses. However, the Manager's Special Capital Account will receive a quarterly incentive allocation described in Section 7(c), and will be debited for any withdrawals. The size of the Manager's Special Capital Account will in no way increase the rights and/or power of the Manager with respect to the Members and/or Company.

(c)    **Incentive Allocation.** The Manager's Special Capital Account will be credited at each quarter-end with 20% of each Member's share of the Company's New Trading Profits at of the end of such quarter (the "Incentive Allocation")

New Trading Profits for purposes of calculating the Manager's Incentive Allocation during a calendar quarter shall mean the cumulative profits (over and above the aggregate of previous period profits as of the end of any quarter) during the quarter. New Trading Profits shall include both realized and unrealized profits. New Trading Profits shall include interests received by the Company on its assets, less accrued fees and commissions (if any). If New Trading Profits for the quarter are negative, it shall constitute a "Carry-forward Loss" for the beginning of the next quarter. To the extent that any funds are withdrawn from Company's account(s), any loss attributed to the funds shall be deducted from the Carry-forward Loss. No Incentive Allocation shall be payable until future New Trading Profits for the ensuing quarters exceed Carry-forward Loss.

(d)    **Allocation of Profit and Loss for Federal Income Tax Purposes.** As of the end of each fiscal year, the Company's realized capital gain or loss and ordinary income or loss shall be allocated among the Members in the proportion which their respective capital accounts bear to the total account of all Members. Any Member who redeems his or her Interest (or any portion thereof) during any fiscal year will be allocated his or her proportionate share of the capital gain or loss and ordinary income or loss realized by the Company during the period that such Interest was owned by such Member.

(e)    **Expenses Assumed by Company.** The Company shall be responsible for the following expenses:

> (i)    **Offering and Organizational Expenses.** The Company will be responsible for all organizational and offering expenses including, but not limited to, attorney's fees, accountant's fees and filing fees.

> (ii)    **Operating Expenses.**    The Company will be responsible for payment of its ongoing operating expenses, including but not limited to, ordinary accounting, auditing and legal expenses, and periodic bank service charges.

> (iii)    **Management Fees.** The Company will pay the Manager a monthly management fee of 0.1667% (or 2% per year) based on the month-end Net Asset Value of the Company. Net asset value is defined as the Company's total assets less total liabilities, as determined on the basis of generally accepted accounting principles, consistently applied.

(iv)   **Transaction Fees and Expense.**   The Company will pay any fees and expenses associated with the Investments, including but not limited to brokerage commissions, exchange fees, and interest charges.

(v)   **Advisory Fees.**  All or a portion of the Company's assets may be directly allocated to trading advisors.  Such trading advisors will likely charge fees, such as management fees and incentive fees, which will be paid by the Company.  Therefore, the investment return of the Company will be net of the expenses charged by these trading advisors.

(vi)   **Investments in Other Funds.**   All or a portion of the Company's assets may be invested in the other funds.  The Company will indirectly bear its pro rata share of the fees and expenses incurred by the Underlying Funds.  Therefore, the investment return of the Company will be net of the expenses of the funds in which it may invest.

(vii)   **Selling Commission.**   Members whose participation in the Company is solicited by Selling Agents may be assessed a selling commission.

(viii)   **Miscellaneous.**  The Company is responsible for any extraordinary expenses including, but not limited to extraordinary legal expenses. However, no extraordinary expenses are anticipated.

(f)   **Return of a Member's Capital Contribution.**  A Member shall have the right to withdraw capital through redemption and shall be entitled to distributions in accordance with the terms of this Agreement. In no event shall a Member be entitled to demand or receive property other than cash.

(g)   **Distributions.**  The Manager shall have sole discretion in determining what distributions (other than redemptions, which may be made at the discretion of any Member as described in paragraph 9 below), if any, the Company will make to its Members. Distributions will be pro rata in accordance with the respective capital accounts of the Members. However, the Manager does not anticipate a distribution of profits, if any, to Members. Rather, the Manager anticipates that to the extent that the Company trading generates profits, these profits will remain Company assets and will be used to further finance additional Investments.

8.   **Reports to Members.**

Each Member shall be furnished with such reports as are required to be given to Members by the rules and regulations promulgated by the Commodity Futures Trading Commission and any other reports as are required by any other governmental authority which has jurisdiction over the activities of the Company.  Members may also be furnished with any other reports or information which the Manager, in its discretion,

determines to be necessary or appropriate. Appropriate tax information (adequate to enable each Member to complete and file his Federal income tax return) shall be delivered to each Member no later than 90 days following the end of each fiscal year.

9.    **Redemption of Interests.**

Members may withdraw any or all of their Capital Accounts - as of the last trading day of any month (the "effective date") - based upon the value of their respective Interests on the effective date. Members must give written notice to the Manager fifteen (15) days prior to the month's end in order to make such a withdrawal. Therefore, the value of an Interest on the effective date (last trading day of the month) may substantially differ from its value on the date that the redemption is requested.

Redemptions are effective as of the close of business on the last day of the month in which a Request for Redemption in proper form has been received by the Manager in a timely manner. A "Request for Redemption" is a letter in the form specified by the Manager, sent by a Member (or any approved assignee thereof) and received by the Manager at its main business office at least fifteen days prior to the end of the month in which redemption is to be effective. A form of Request for Redemption is annexed to this Agreement at page A-12. Additional forms of Request for Redemption may be obtained by written request to the Manager.

Upon Redemption, a Member (or any approved assignee thereof) will receive an amount equal to the redemption amount requested, less any amount that is owed by such Member (and his approved assignee, if any) to Manager as provided below in this paragraph or to the Company in accordance with this Agreement. If, pursuant to applicable law, the Company has been required to withhold tax on certain income of the Company allocable to a Member (or an assignee thereof) and the Manager has paid out of its own funds such tax, upon redemption of an Interest by such Member (or assignee) all amounts of such taxes may be deducted from the Member's Capital Account and reimbursed to the Manager. In addition, upon redemption of Interests, all amounts that are owed to the Company under the indemnification provisions of this Operating Agreement by the Member to whom such Interest was issued as well as all amounts that are owed by all assignees of such Interest will be deducted from the Member's Capital Account prior to redemption.

The Manager will endeavor to pay redemptions no later than 60 days after the Redemption Date, and the Company's investments and/or commodity interest positions will be liquidated to the extent necessary to effect redemptions. Under certain circumstances (including, without limitation, the Company's inability to liquidate positions or the default or delay in payments due the Company from brokers, banks, or other persons), the Company may delay payment to Members requesting redemption of the proportionate part of the Member's Capital Account represented by the sums that are the subject of such default or delay. The right to obtain payment on redemption is contingent upon (i) the Company having assets on the Redemption Date sufficient to

discharge its liabilities, and (ii) receipt by the Manager of a Request for Redemption as described above.

10.    **Assignability.**

Members may not sell, assign or transfer (nor offer to sell, assign, or transfer) their Interests in the Company without the express written consent of the Manager, which may be withheld in the Manager's sole discretion.  A permitted assignee will become a substitute Member, who will be subject to the assignor's rights and liabilities under the Company Agreement.  Any sale, exchange or other transfer by any Member of any Interest that is not approved in writing by the Manager shall be void and ineffective, and shall neither bind nor be recognized by the Company nor by any other party.  No purported assignee shall have any right to any profits, losses or distributions of the Company.

11.    **Admissions of Additional Members.**

Additional Members may be admitted to the Company.  Newly admitted Members shall contribute cash to the Company in exchange for Interests as provided under paragraph 6 of this Agreement, and shall execute any and all documents then required by the Manager.

12.    **Limited Power of Attorney.**

Each Member irrevocably appoints Innovative Capital Management, L.L.C., as his or her attorney-in-fact to execute, acknowledge, swear to, deliver, file, record and publish, as appropriate: amendments to this Agreement hereto as described in Section 14; the Articles of Organization and amendments thereto; certificates of assumed name for the Company; and any other instruments appropriate to conduct the Company's business.

13.    **Withdrawal or Death of the Manager or a Member.**

The retirement, resignation, dissolution, termination, insolvency or withdrawal of the Manager shall dissolve and terminate the Company unless the Company is continued pursuant to paragraph 14(c) hereof.  The Manager may withdraw from the Company at any time on 30 days written notice sent first class mail, postage prepaid, to each Member.

The death, legal disability, withdrawal, insolvency or dissolution of a Member shall not terminate or dissolve the Company, and such Member, his estate, custodian or personal representative shall have no right to withdraw or value such Member's Interest in the Company except as provided in this Agreement.

14.    **Amendments and Meetings.**

(a)    **Amendments with Consent of the Manager.**  If, at any time during the term of the Company, the Manager shall deem it necessary or desirable to amend this Agreement, such amendment shall be effective if embodied in an instrument signed by the Manager. Any such supplemental or amendatory agreement shall be adhered to and have the same effect from and after its effective date as if the same has originally been embodied in and formed a part of this Agreement; provided, however, that no such supplemental or amendatory agreement shall, without the consent of all Members, change or alter this Section 14, extend the term of the Company, reduce the capital account of any Member or modify the percentage of profits, losses or distributions to which any Member is entitled.

(b)    **Meetings.**  Any Member upon written request addressed to the Manager shall be entitled to obtain from the Manager, at the Member's expense, a list of the names and addresses of record of all Members and the percentage of the aggregate Interests of the Company held by each, provided that the Member agrees and represents that the list will not be used for commercial purposes.  Upon receipt of a written request, signed by Members owning at least 25% of the aggregate Interests of the Company then owned by Members, that a meeting of the Company be called to vote upon any matter which the Members may vote upon pursuant to this Agreement, the Manager shall, by written notice to each Member of record mailed within 15 days after such receipt, call a meeting of the Company.  Such meeting shall be held at least thirty but not more than sixty days after the mailing of such notice and shall specify the date, a reasonable place and time, and the purpose of such meeting.

(c)    **Amendments and Actions Without Consent of the Manager.**  At any meeting called pursuant to Section 14(b), upon the affirmative vote (which may be in person or by proxy) of Members owning more than 50% of the aggregate Interests of the Company then owned by the Members, the following actions may be taken: (i) this Company Agreement may be amended provided, however, that no such supplemental or amendatory agreement shall, without the consent of all Members, change or alter this Section 14, extend the term of the Company, reduce the capital account of any Member or modify the percentage of profits, losses or distributions to which any Member is entitled; (ii) the Company may be dissolved; (iii) the Manager may be removed and replaced; (iv) a new Manager or Members may be elected if the Manager elects to withdraw from the Company; (v) any contracts with the Manager or any of its affiliates may be terminated on sixty days notice without penalty; and (vi) the sale of all the assets of the Company may be approved provided, however, that no such action may be taken if a court of competent jurisdiction has entered a final order to the effect that the action to be taken will adversely affect the status of the classification of the Company as a "partnership" under the Federal income tax laws.  The term "final order" shall mean an order which is not subject to any further court proceedings for appeal, review or modification. All of the actions set forth in this paragraph may be taking by written resolution without the necessity of a formal meeting.

15.     **No Personal Liability for Return of Capital.**

The Manager shall not be liable for the return or repayment of all or any portion of the capital or profits of any Member, it being expressly agreed that any such return of capital or profits made pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from the Manager) of the Company.

16.     **Indemnification.**

(a)     **By the Company.**   The Company shall indemnify, defend and hold harmless the Manager, and its employees and affiliates from and against any loss, liability, damage, cost or expense (including legal fees and expenses) and any amounts paid in settlement thereof (provided that the Company shall have approved such settlement) resulting from or relating to its actions or capacity as Manager, or otherwise concerning the business or activities undertaken on behalf of the Company, provided that the act or omission which was the subject of the demand, claim or lawsuit did not constitute gross negligence, willful or wanton misconduct, or breach any fiduciary obligations to the Company.

Any indemnification ordered or expressly permitted by a court, shall be made by the Company only upon a determination by independent legal counsel in a written opinion that the conduct which is the subject of a claim, demand or lawsuit with respect to which indemnification is sought meets the applicable standards set forth in said paragraph.

(b)     **By the Members.**   In the event the Company is made a party of or to any claim, dispute or litigation or otherwise incurs any loss or expense as a result of or in connection with any Member's obligations or liabilities unrelated to the Company business, such Member shall indemnify and reimburse the Company for all loss and expenses incurred, including reasonable attorney's fees.

17.     **Governing Law.**

The validity and construction of the Agreement shall be determined and governed by the laws of the State of New York.

18.     **Miscellaneous.**

(a)     **Priority Among Members.**   No Member shall be entitled to any priority or preference over any other Member with regard to the affairs of the Company.

(b)     **Notices.**   All notices under this Agreement, other than reports by the Manager to the Members, shall be in writing and shall be effective upon personal delivery, or if sent by registered or certified mail, postage prepaid, addressed to the last

---

known address of the party to whom such notice is given, upon deposit of such notice in the United States mails. Reports by the Manager to the Members shall be in writing and shall be sent first class mail to the last known address of each Member.

(c)     **Binding Effect.** This Agreement shall inure to and be binding upon all of the parties, their successors, assigns as permitted herein, custodians, estates, heirs and personal representatives. For purposes of determining the rights of any Member hereunder, the Company and the Manager may rely upon the Company records as to who are Members and all Members agree that their rights shall be determined and that they shall be bound thereby, including all rights which they may have under Sections 9, 10 and 14 hereof.

(d)     **Captions.** Captions in this Agreement no way define, limit, extend, or describe the scope of this Agreement nor the effect of any of its provisions.

(e)     **Counterparts.** This Agreement may be executed in several counterparts, and all such executed counterparts shall constitute an agreement, binding on all parties hereto, notwithstanding that all the parties are not signatories to the same counterpart.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the _____ day of _____, 20___.

Manager:
Innovative Capital Management, L.L.C.


By: _____
    Yehuda Belsky

Member(s):

_____


_____

# INNOVATIVE CAPITAL FUND, L.L.C.

## REQUEST FOR REDEMPTION

**To:**   **Innovative Capital Management, L.L.C.**
**4205 Avenue M**
**Brooklyn, New York 11234**


The undersigned hereby requests redemption of US$_____ of my Interest in the Company, less any amount the undersigned owes the Company. The undersigned hereby represents and warrants that he or she is the true and lawful owner of the Interest to which this request relates with full power and authority to request redemption of such Interest. Such Interest is not subject to any transfer, assignment, pledge or otherwise encumbered in any fashion. This redemption will be governed by the terms of the Operating Agreement. Redemption shall be effective at the end of the month, if available that month, provided the Manager shall have received this notice fifteen (15) days prior to the effective date of the requested redemption.

Please forward funds to the undersigned at the address below.


_____


_____
Name(s)


_____          _____
Number and Street                                            Signature(s)


_____          _____
City                    State          Zip


_____

**Innovative Capital Fund L.L.C.**                                              **A-12**

<u>**EXHIBIT B**</u>

**INNOVATIVE CAPITAL FUND, L.L.C.**

**SUBSCRIPTION AGREEMENT/LIMITED POWER OF ATTORNEY**

**To:**   **Innovative Capital Management, L.L.C.**
  **4205 Avenue M**
  **Brooklyn, New York 11234**

1.     **Subscription.**   I hereby subscribe for a Limited Liability Company Interest ("Interest") in Innovative Capital Fund, L.L.C.   (the "Company") provided that all necessary subscription documents and contribution is received by the Manager at least five days prior to the month end, as described in the Company's Confidential Private Placement Memorandum, (the "Memorandum"), and hereby tender a check in the amount of $_____ (US$100,000 minimum, unless waived by the Manager).  Upon acceptance of this subscription, I agree to become a Member in the Company and accept and adopt the provisions of the Operating Agreement.  If my subscription is rejected, the amount of my subscription will be promptly returned to me without interest thereon or deduction therefrom.

2.     **Representation and Warranties.**   I hereby represent and warrant to you as follows:

(a)     Simultaneously with acceptance of this subscription by the Company, and by completing, executing and delivering the Power of Attorney included in this Exhibit B and the Confidential Purchaser Questionnaire which is Exhibit C to the Company's Memorandum, I will become a party to the Operating Agreement and will appoint the Manager as my attorney-in-fact to, among other things, execute on my behalf all further amendments to the Operating Agreement, and I will be bound by all of the terms and conditions thereof.

(b)     **I (and my offeree representative, if any) have read, understand and am fully familiar with the Company's Memorandum and the exhibits thereto, particularly, but without limiting the generality of the foregoing, the risks and conflicts of interest applicable to this investment, and am satisfied that I have received adequate information concerning all matters which I consider material to a decision to purchase my Interest.**

(c)     I (and my offeree representative, if any) have had an opportunity to ask questions of and received answers from the Manager concerning the terms and

---

**Innovative Capital Fund L.L.C.**                    **B-1**

conditions of this investment, and all such questions have been answered to my full satisfaction.

(d)    I (and my offeree representative, if any) have such knowledge and experience in financial and business matters that I am capable of evaluating the risks and merits of an investment in the Company.

(e)    I have completed the Confidential Purchaser Questionnaire or the Purchaser Representative Questionnaire, as appropriate, and certify that all disclosures therein are accurate and true.

(f)    I have substantial means of providing for my current needs and personal contingencies and have no need for liquidity in this investment.

(g)    My overall commitment to investments which are not readily marketable or are not liquid is not disproportionate to my net worth and my purchase of the Interest will not cause my overall commitment in this type of investment to become excessive.

(h)    I have substantial experience in making investment decisions of this type or am relying upon my own qualified purchaser representative in making this investment decision.

(i)    Where appropriate, I have consulted my lawyer, accountant, or other advisor with respect to my investment and all books, records and documents pertaining to the investment have been made available to me and such advisors by the Company.

(j)    Except as set forth in the Company's Memorandum and the Exhibits thereto (the "Offering Documents"), no representations or warranties have been made to me by the Company, the Manager or any agent, employee or affiliate of either of them, in entering into this transaction, and I am not relying upon any information, other than that contained in such Offering Documents and the results of my own independent investigation.

(k)    I understand that the Interests have not been registered under the Securities Act of 1933, as amended, that the Interests have not been approved or disapproved by the Securities and Exchange Commission or by any federal or state agency, and that no such agency has passed on the accuracy or adequacy of the Company's Confidential Private Offering Memorandum.

(l)    I am acquiring my Interest hereunder for my own account, for investment purposes only, and not with a view to the sale or other distribution thereof, in whole or in part.

---

(m)   If the undersigned is a corporation, trust, partnership, or limited liability company ("Business Organization(s)", collectively), the officer executing this Subscription Agreement represents and warrants that he or she is authorized to so sign; that the Business Organization is authorized by the applicable governing written instrument to make this investment and to enter into the Operating Agreement and this Subscription Agreement.

The Business Organization will, upon request of the Manager or counsel to the Company, furnish to the Company a true and correct copy of the applicable governing written instrument authorizing the Business Organization to make such investment, and a copy (certified by the authorized officer) of applicable governing written instrument authorizing the specific investment.

3.     I understand the meaning and legal consequences of the representations and warranties contained in paragraph 2 hereof and I hereby agree to indemnify and hold harmless the Company and the Manager and each Member thereof from and against any and all loss, damage or liability due to or arising out of any breach of any representation or warranty of the undersigned, whether contained in the Company Agreement or this Subscription Agreement.   Notwithstanding any representation or warranty of the undersigned, whether agreements made herein by me, I do not thereby or in any other manner waive any rights granted to me under federal or state laws.

4.     I understand that this Subscription is not binding on the Company until the Company accepts it, which acceptance is at the sole discretion of the Manager, by executing this Subscription Agreement where indicated.

5.     All notices or other communications to be given or made hereunder shall be in writing and shall be delivered personally or mailed, by registered or certified mail, return receipt requested, postage prepaid, to the undersigned or to the Company, as the case may be, at the respective address set forth herein.

6.     **Limited Power of Attorney.**  Subscriber irrevocably constitutes and appoints the Manager, Innovative Capital Management, L.L.C., as his true and lawful attorney-in-fact with full power of substitution and with authority in subscriber's name, place and stead, to execute, acknowledge, deliver, swear to, file and record:

(a)   The Operating Agreement;

(b)   Amendments to the Operating Agreement;

(c)   Articles of Organization and all amendments thereto;

---

**Innovative Capital Fund L.L.C.**                                    **B-3**

(d)     All documents necessary to qualify or continue the Company in the states where it may do business;

(e)     All instruments which effect a change or modification of the Operating Agreement in accordance with the terms thereof;

(f)     All conveyances, instruments, or documents necessary to carry on the business of the Company including, but not limited to, futures brokerage agreements with any futures brokerage firm or to effect the dissolution of the Company; and

(g)     All other filings with governmental agencies that are necessary or desirable to carry out the business of the Company.

This power of attorney shall be deemed coupled with an interest, shall be irrevocable and shall survive a subscriber's death or disability.

7.     **Items to be Delivered by Subscriber.**

   a. An originally executed Operating Agreement (attached as Exhibit A to the Memorandum);
   b. An originally executed Subscription Application and Agreement and Limited Power of Attorney (attached to the Memorandum as Exhibit B);
   c. A completed and executed Confidential Purchaser Questionnaire or Purchaser Representative Questionnaire (attached as Exhibit C to the Memorandum), as appropriate;
   d. An executed Acknowledgement of Receipt of Innovative Capital Fund, L.L.C.'s Confidential Private Placement Memorandum (attached as Exhibit D to the Memorandum); and
   e. A check made payable to "Innovative Capital Fund, L.L.C." or a wire transfer to the Company's bank account maintained at Citibank located in Brooklyn, New York.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement the date set forth below.

_____

Date

_____

Subscriber's Name (print)

_____

Signature(s) of Subscriber(s)

_____

Please print information below as you wish it to appear in the records of the Company:

RESIDENCE ADDRESS

_____
Number and Street

       _____
       Name(s)

_____
City   State     Zip

       _____
       Social Security Number or
       Taxpayer Identification Number

Address for Notices if different from above:

_____
Number and Street

_____
City   State     Zip

## REPRESENTATIONS BY EMPLOYEE BENEFIT PLANS

The undersigned on behalf of the subscribing employee benefit plan, represents that all of the obligations and requirements of the Employee Retirement Income Securities Act of 1974, including prudence and diversification, with respect to the investment of trust assets in Innovative Capital Fund, L.L.C. (the "Company") have been considered prior to subscribing for an Interest in the Company ("Interest").  The person with investment discretion on behalf of the plan has consulted his attorney or other tax adviser with regard to whether the purchase of the Interest might generate "unrelated business taxable income" under Section 512 of the Internal Revenue Code.  By signing this representation letter, the trustee or custodian subscribing for the Interest assumes full responsibility for evaluating the appropriateness of the investment and represents that he has (i) authority to make this investment on behalf of the plan, (ii) authorization to sign this Representation Letter and (iii) performed his duties with respect to the plan solely in the interest of the participants of the plan with due care, skill and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise.

_____     _____
Date                                (Name of Plan)

                                    By: _____
                                          (Trustee)

## INNOVATIVE CAPITAL FUND, L.L.C.

## CERTIFICATE OF INTEREST

## (SPECIMEN)

The subscription from _____, is hereby accepted by the Company this _____ day of _____, 20___, for an Interest in the limited liability company known as Innovative Capital Fund, L.L.C. initially valued at US$_____.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the _____ day of _____, 20___.

Manager:                                          Member(s):

Innovative Capital Management, L.L.C.   _____

                                                   _____

By: _____
        Yehuda Belsky

This Limited Liability Company Interest in INNOVATIVE CAPITAL FUND, L.L.C. has not been registered under the Securities Act of 1933 or state securities laws and cannot be resold unless registered under applicable federal or state securities law or unless an exemption from registration is available.  Transfer and redemption of interests are subject to restrictions contained in the Operating Agreement.

<u>**EXHIBIT C**</u>

**INNOVATIVE CAPITAL FUND, L.L.C.**

**CONFIDENTIAL PURCHASER QUESTIONNAIRE**

Interests (referred to as "Interests") are being offered in Innovative Capital Fund, L.L.C. (the "Company") to a limited number of qualified investors pursuant to the Company's Confidential Private Placement Memorandum.

Before you may purchase an Interest, the Manager, Innovative Capital Management, L.L.C., must be reasonably satisfied that you, either alone or with a "Purchaser Representative", have such knowledge and experience in financial and business matters that you are capable of evaluating the risks and merits of investing in the Company. This questionnaire is designed to enable the Manager to make that determination.

**BECAUSE THE MANAGER WILL RELY ON YOUR ANSWERS IN ORDER TO COMPLY WITH FEDERAL AND STATE LAWS, YOU MUST CAREFULLY ANSWER EACH QUESTION. PURCHASERS CAN BE HELD LIABLE FOR ANY MISSTATEMENT OR OMISSION IN THIS QUESTIONNAIRE.**

The Manager will maintain the confidentiality of all information disclosed by you, except as provided in the Operating Agreement, or as is necessary to comply with requests for such information from a regulatory body or pursuant to court order.

Part I.    <u>**General Information**</u>

Please print or type.  Answer every question.  Insert "Not Applicable" or "NA" if a question does not apply to you.  Attach separate sheets if necessary.  If joint contributors, each contributor should complete a questionnaire.

1.    Contributor's Name:  _____

        Age:  _____    Social Security or Tax I.D. Number:  _____

2.    Name(s) of any joint contributor(s):  _____

        _____

3.    Contributor's Home Address: _____

        _____

        Home Telephone Number:    (__) _____

4.    Name of Contributor's Employer or Business:

        _____

**Innovative Capital Fund L.L.C.**                    **C-1**

Nature of Business: _____

Position/Title: _____

Length of Time in Position: _____

Business Address: _____

_____

Business Telephone Number: (____) _____

5.   Send correspondence to:  Home _____ Business _____

6.   Do you (and any joint contributor(s)) intend to purchase the interest solely for your own account?

        Yes _____   No _____

If not, please indicate who else would have a direct or indirect interest in the interest to be purchased:

_____

What is the nature of that interest (e.g., beneficiary under a trust)?

_____

What is the relation to you of the person(s) holding such interest (e.g., spouse, partner, stockholder)?

_____

What is the residence address of the person(s) having such interest?

_____

(Persons having such an interest may in the discretion of the Manager be required to complete a separate questionnaire.)

7.   Are you:

(a)   An individual whose (i) gross income exceeded US$200,000 in each of the last two years and who reasonably expects your individual gross income to be in excess of US$200,000    in the current year; or (ii) whose gross income with your spouse

**Innovative Capital Fund L.L.C.**        C-2

exceeded US$300,000 in each of the past two years and who reasonably expects your joint income to exceed that amount in the current year?

Yes _____ No _____

(b)     An individual whose net worth (including home, furnishings and automobiles), or joint net worth with your spouse, exceeds US$1,000,000?

Yes _____ No _____

(c)     An individual who is a director or executive officer of the Company?

Yes _____ No _____

(d)     An entity in which all the equity owners meet the requirements of (a), (b) or (c) above?

Yes _____ No _____

(e)     A bank, savings and loan association or other similar institution acting in its individual or fiduciary capacity?

Yes _____ No _____

(f)     A broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934?

Yes _____ No _____

(g)     An organization described in §501(c)(3) of the Internal Revenue Code, a corporation, business trust or partnership that was not formed for the specific purpose of investing in the Fund and whose total assets exceed US$5,000,000?

Yes _____ No _____

(h)     A trust of any type that: (i) has total assets exceeding US$5,000,000, (ii) was not formed for the specific purpose of investing in the Company and (iii) whose investment in the Company is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of investing in the Company?

Yes _____ No _____

(i)     A plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of US$5,000,000?

Yes _____ No _____

---

(j)    An employee benefit plan under title I of ERISA: (i) whose investment decision is made by a plan fiduciary as defined in ERISA §3(21) that is a bank, savings and loan association, insurance company or registered investment adviser, (ii) whose total assets exceed US$5,000,000, or (iii) is a self-directed plan whose investment decisions are made solely by accredited investors (see (a) and (b) above)?

       Yes _____ No _____

(k)    An individual who is not a citizen or resident of the U.S.?

       Yes _____ No _____

(l)    A corporation or other entity none of whose beneficial owners are citizens or residents of the U.S.?

       Yes _____ No _____

**IF YOU ANSWERED "YES" TO ANY PART OF QUESTION 7, GO DIRECTLY TO PART II; OTHERWISE ANSWER QUESTIONS 8 AND 9 BELOW.**

8.     Check the category which describes your net worth, defined as the excess of total assets (including home, furnishings, and automobiles) over total liabilities.

| | | | |
|---|---|---|---|
| ___ | $   0 - $ 30,000 | ___ | $100,001 - $150,000 |
| ___ | $30,001 - $ 50,000 | ___ | $150,001 - $200,000 |
| ___ | $50,001 - $ 75,000 | ___ | $200,001 - $500,000 |
| ___ | $75,001 - $100,000 | ___ | Over $500,000 |

9.     Check the category which describes your estimated annual gross income.

| | | | |
|---|---|---|---|
| ___ | $   0 - $ 30,000 | ___ | $100,001 - $150,000 |
| ___ | $30,001 - $ 50,000 | ___ | $150,001 - $200,000 |
| ___ | $50,001 - $100,000 | ___ | Over $200,000 |

**Part II.** **Investment Knowledge and Experiences**

1.     Check highest level of school attended and indicate field of study and type of degree received, if any:

| | Level | Field of Study | Degree |
|---|---|---|---|
| High School | ____ | _____ | _____ |
| College | ____ | _____ | _____ |
| Graduate School | ____ | _____ | _____ |

---

Innovative Capital Fund L.L.C.                                      C-4

Other                    _____ _____      _____

2.    Describe any previous employment, training or experience which has contributed to your knowledge and experience in financial and business matters generally or the futures markets specifically:

_____

_____

3.    Have you invested in any other commodity pools?

_____

_____

_____

_____

4.    Have you invested in other limited partnerships ("LP's") or limited liability companies ("LLC's")?

      Yes _____ No _____

If yes, indicate number of LP's and/or LLC's, type of company (e.g., real estate, oil and gas), date of investment and amount of investment:

_____

_____

_____

_____

5.    Have you:

(a)    Traded futures contracts?

      Yes _____ No _____

If yes, indicate if -- and when -- you directed your own trading.

_____

---

Innovative Capital Fund L.L.C.                          C-5

(b)     Traded securities?

Yes _____ No _____

If yes, indicate if -- and when -- you directed your own trading.

_____

_____

(c)     Traded stock options?

Yes _____ No _____

If yes, indicate if -- and when -- you directed your own trading.

_____

_____

**Part III.**     <u>Purchaser Representative</u>

1.     If you are relying upon an adviser or advisers (a "Purchaser Representative") such as a lawyer, accountant or other investment adviser to advise you in deciding whether to invest in the Company or some other person to whom you have given a power of attorney or other authorization to make investment decisions on your behalf, furnish the Representatives' name(s) and other information below and have the Representative(s) complete a Purchaser Representative Questionnaire.

Name: _____

Profession: _____

Address: _____

_____

Telephone:     (___) _____

2.     Are you relying solely on such adviser(s) in determining whether to invest in the Company, or are you relying on the advice of others?  If the latter, furnish such person's name and other information requested below.

Name: _____

Profession: _____

Innovative Capital Fund L.L.C.                    C-6

Address: _____

_____

Telephone: (____) _____

**Part IV.**     <u>Representations</u>

I acknowledge that the Manager will be relying upon the information I have furnished in this Questionnaire in determining, among other things, whether there are reasonable grounds to believe that I qualify as an accredited investor under Rule 501 under the Securities Act of 1933 or otherwise qualify as a suitable or sophisticated investor under federal and state securities laws. To the best of my information and belief, the information I have supplied is complete and correct, and I represent and warrant to the Manager as follows:

1.     The answers to the above questions are complete and correct and may be relied upon by the Manager in determining whether this offering will be exempt from registration under applicable securities laws.

2.     Prior to receiving notice of the Manager's acceptance of my subscription, I will notify the Manager immediately of any material change in any information I have furnished in this Questionnaire.

3.     I personally (or with my Purchaser Representative(s), if any) have sufficient knowledge and experience in financial and business matters to evaluate the merits and risks of an investment in the Company.

4.     I am able to bear the economic risk and lack of liquidity of an investment in the Company, and at the present time could afford a complete loss of such investment.

5.     After receiving notice of the Manager's acceptance of my contribution, I will immediately advise the Manager in writing of any material change in the information I have supplied in this Questionnaire, and I will provide at any time any additional information the Manager may reasonably request concerning the information I have supplied in this Questionnaire.

_____          _____
(Signature)                                (Date)

_____
(Printed Name of Purchaser)

If entity:

_____          _____
(Title of person signing)                  (Name of entity)

_____

Innovative Capital Fund L.L.C.                                    C-7

================================================

| | |
|---|---|
| **NOTE TO CORPORATIONS:** | Please attach evidence of authorization to purchase an Interest in the Company, in form of resolutions or Articles of Incorporation and By-Laws. |
| **NOTE TO PARTNERSHIPS:** | Please attach copy of the Partnership Agreement. |
| **NOTE TO TRUSTS:** | Please attach copy of the instrument creating the Trust (Trust Agreement). |
| **NOTE TO ESTATES:** | Please attach copy of the Will and current Letters Testamentary. |
| **NOTE TO LIMITED LIABILITY COMPANIES:** | Please attach copy of the Operating Agreement. |

**EXHIBIT D**

## ACKNOWLEDGEMENT OF RECEIPT
## OF INNOVATIVE CAPITAL FUND, L.L.C.'S
## CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

Gentleman:

This is to acknowledge that I have received, read, and understood Innovative Capital Fund, L.L.C.'s Confidential Private Placement Memorandum dated January 15, 2008.

I understand the risks of commodity trading and represent to Innovative Capital Fund, L.L.C. that the trading program described in this Disclosure Document would be an appropriate investment for me in light of my financial circumstances.

Read and Acknowledged by:

_____

Client's Signature


_____

Date


Read and Acknowledged by:

_____

Client's Signature


_____

Date

Innovative Capital Fund, L.L.C.                    D-1

<u>**EXHIBIT E**</u>

## GRAMM-LEACH-BLILEY
## CONSUMER PRIVACY NOTIFICATION

This notice is being provided to inform you of Innovative Capital Management, L.L.C.'s ("Innovative ") consumer privacy policies as required under the Gramm-Leach-Bliley Act.

In providing you with financial products and services, Innovative receives nonpublic personal information about you from the following sources:

1.     Information we receive from you on Innovative's subscription documents, applications or other forms.
2.     Information about your transactions with us, our affiliates, or others.
3.     Information we receive from other futures industry participants.

In providing you with financial products and services, Innovative may collect the following types of nonpublic personal information about you.

1.     Information Innovative receives from you on account applications and/or subscription documents, whether written or electronic, or on other forms. This information would include your name, address, social security number, income, investment experience, investment objectives, etc.
2.     Information about your transactions with our affiliates, others, or us. This information could include your trading through our affiliates, others, and us your history of meeting margin calls, paying debit balances and your use of the various products and services that our affiliates and we provide.
3.     Information about you obtained in connection with our efforts to protect against fraud, money laundering activities, or unauthorized use of your account(s) with us. Innovative may disclose the types of the nonpublic personal information listed above to other financial institutions with which Innovative has joint marketing agreements, broker-dealers, futures commission merchants, investment companies, investment advisers, commodity trading advisors, commodity pool operators and other financial service participants. Innovative may disclose your nonpublic personal information to other nonaffiliated third parties as permitted by law, such as in response to a subpoena or legal process or in order to complete a transaction, which you initiated and authorized.

If you prefer that Innovative not disclose your nonpublic personal information to unaffiliated third parties, you may opt out of those disclosures. That is, you may direct Innovative not to make those disclosures other than permitted by law. However, you may not opt out of the subscription documents provided by Innovative or any service provider necessary to effect or process any transaction in your account(s) with Innovative.

If you wish to opt out of disclosure to nonaffiliated third parties, please contact Innovative so that we may honor your request.

# INNOVATIVE CAPITAL FUND

## <u>WIRING INSTRUCTIONS</u>

CITIBANK, N.A.
1501 KINGS HIGHWAY
BROOKLYN, NY 11229

ABA # 021-000-089

FURTHER CREDIT TO:
INNOVATIVE CAPITAL FUND, LLC
ACCT # 4815-8026



_____ 2/1/ 2008

Cedarbrook Partners
Attn: Jacob Spinner

Re: Security Interest in Partnership Interest

Dear Sirs:

You have requested our consent to a grant by you to The Caroline
and Joseph S. Gruss Life Monument Funds, Inc. ("Gruss Funds") of
a security interest in the maximum amount of $300,000 of the

limited partnership of interest of
Cedar brook Partners in Innovative Capital Fund, LLC ("ICF")
_____, which has a current market value in
excess of $ 315,000 . We acknowledge that Gruss Funds
has requested our consent to the grant of such security interest
in connection with certain financing to be provided at your
request by Gruss Funds.

By countersigning and returning to us this letter, both you and
Gruss Funds acknowledge to ICF that the Partnership
will, notwithstanding your grant of a security interest to Gruss
Funds, continue to be a limited partner of ICF
having all the rights of a limited partner under the Limited
Partnership Agreement of ICF (the "Partnership
Agreement") until such time as ICF receives
notice ( the "Notice of Foreclosure" ) from Gruss Funds that
Gruss Funds requests payment on its security interest in your
limited partnership interest in ICF . You and Gruss
Funds agree that ICF will deem such Notice of
Foreclosure to be genuine and accurate without any investigation
as to whether such Notice of Foreclosure is bona fide or
authorized or as to the basis for such Notice of Foreclosure.
ICF hereby agrees that, from and after the first
day of the calendar month that occurs at least two business days
after it receives such Notice of Foreclosure, (i) it shall deem
Gruss Funds to be an assignee of your limited partnership
interest in ICF , to the extent of its security
interest, not to exceed $300,000 maximum amount, with all the
rights of an assignee of a limited partnership interest under
New York law, and (ii) Gruss Funds, and not the Partnership,
shall be entitled to make withdrawals on the terms provided in

10

the Partnership Agreement with respect to limited partners, but only to the extent of its security interest, not to exceed $300,000 maximum amount.

Upon receipt of a fully executed copy of this letter, _____ICF_____ will record Gruss Funds' security interest in its books and records. You agree that prior to receipt of a Notice of Foreclosure, _____ICF_____ will make no payment or distribution to you if, or to the extent that as a result of such payment or distribution, the current market value of the Partnership's interest in _____ICF_____ shall then have a current market value of less than $300,000.

In order to induce _____ICF_____ to agree to this assignment and in consideration thereof, you agree to indemnify and hold _____ICF_____ harmless from and against any and all claims, losses, damages, liabilities, expenses and reasonable legal fees and disbursements which _____ICF_____ may incur as a result of the security interest or assignment, the action or inaction of _____ICF_____, your action or inaction or the action or inaction of Gruss Funds, other than such liabilities and expenses which arise as a result of the willful misconduct or gross negligence of _____ICF_____. In no event shall _____ICF_____ be held liable by you for any payment made to Gruss Funds or the delivery of any document to Gruss Funds in accordance with the provisions of this letter.

Space has been provided on the following page for acknowledgment by Gruss Funds and you of the foregoing. Upon receipt of a signed copy of this letter, our consent to the grant of a security interest will be deemed to be effective and we will recognize Gruss Funds as a secured party.

Very truly yours

By : YEHUDA BELSKY, INNOVATIVE CAPITAL FUND, LLC

its Managing Member

11



**From: jspinner@tmo.blackberry.net** <jspinner@tmo.blackberry.net>
Date: Feb 29, 2008 11:02 AM
Subject: Fw:
To: G Mail <jacobjspinner@gmail.com>

Sent via BlackBerry from T-Mobile

-----Original Message-----
From: <ybelsky@innovativecta.com>

Date: Fri, 29 Feb 2008 10:57:20
To:<jspinner@tmo.blackberry.net>
Subject:

Yaakov,

It was indeed painful for me to read your message. You are right: you trusted me as a friend and I betrayed that. Not to defend, but when I disseminated profitable percentage updates those were real and actual performances of my program. It was my every intention to get the Fund to such level so that you (along with Fund investors) would realize those returns. The recent turn of events has been indescribably catastrophic, to the point of affecting physical health. I am tormented with the weight of finding some way to survive, with the only business I know now closed to me. Although I cannot give you a time frame, I am committed to restoring to you your full principal investment. I do not want to take further advantage with anything less. I also thank you for your kind words in closing: they are meaningful.

Yehuda Belsky



UNITED STATES OF AMERICA
Before The
COMMODITY FUTURES TRADING COMMISSION

------------------------------------------------------------x

In the Matter of                              :           CFTC Docket No. 09-04

                                              : .
Yehuda Belsky and Innovative Capital Management, LLC,    :

                   Respondents.               :

                                              :

------------------------------------------------------------x

## ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT AND MAKING FINDINGS AND IMPOSING SANCTIONS

### I.

The Commodity Futures Trading Commission ("Commission") has reason to believe that Yehuda Belsky ("Belsky") and Innovative Capital Management, LLC ("Innovative"), (collectively, "Respondents"), have violated Sections 4b(a)(2)(i), (ii) and (iii), 4$o$(1)(A) and (B), and 9(a)(4) of the Commodity Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii), 6$o$(1)(A) and (B), and 13(a)(4) (2006). Therefore, the Commission deems it appropriate and in the public interest that a public administrative proceeding be, and hereby is, instituted to determine whether Respondents have engaged in the violations set forth in this order, and whether an order should be issued imposing remedial sanctions.

### II.

In anticipation of the institution of this administrative proceeding, Respondents have submitted Offers of Settlement ("Offers") that the Commission has determined to accept. Without admitting or denying any of the findings in this Order, Respondents acknowledge service of this Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, and Making Findings and Imposing Sanctions (the "Order"). The Respondents each consent to the entry of this Order and the use of the findings in this Order in this or any other proceeding brought by the Commission or to which the Commission is a party.[1]

---

[1] However, the Respondents do not consent to the use of the Offers, or the findings in this Order consented to in the Offers, as the sole basis for any other proceeding brought by the Commission, other than a proceeding in bankruptcy or to enforce the terms of this Order. Respondents also do not consent to the use of the Offers or this Order, or the findings consented to in the Offers or this Order, by any other party in any other proceeding

## III.

The Commission finds the following:

### A.   SUMMARY

Respondents began operating a commodity pool in February 2006.  From approximately September 2006 to February 2008 (the "Relevant Period"), Respondents fraudulently obtained funds totaling $1,250,000 from five commodity pool participants.  Instead of using the solicited funds to purchase commodity futures and/or options contracts, as represented in solicitation materials, Respondents misappropriated at least $385,000 of those funds, created false commodity pool account statements misstating the net asset value ("NAV") and monthly rates of return of the pool and then delivered these fraudulent statements to pool participants.

In January 2008, the National Futures Association (the "NFA"), a registered futures association, conducted a routine audit of Respondents' commodity pool operation.  During this audit, Respondents made and provided the NFA with fraudulent account statements for the pool that had purportedly been prepared by the futures commission merchant ("FCM") where the pool's account was maintained.  Respondents in fact prepared these statements knowing that they represented fictitious trading activity and falsely reflected the month end balance of funds in the pool's account at the FCM.  Respondents also made and provided the NFA with fraudulent bank statements knowing that these bank statements falsely inflated the amount of pool funds on deposit at the bank.

By this conduct, Respondents committed fraud in violation of Sections 4b(a)(i), (ii) and (iii), 4o(A) and (B), and 9(a)(4) of the Act.

### B.   RESPONDENTS

**Yehuda Belsky** resides in Brooklyn, New York.  Belsky is the sole owner and principal of Respondent Innovative.  Belsky has been registered as an associated person ("AP") and listed as the principal of Innovative since July 2005.

**Innovative Capital Management, LLC** is a New York limited liability company with its principal place of business in Brooklyn, New York.  Innovative has been registered as a commodity trading advisor ("CTA") and as a commodity pool operator ("CPO") since July 2005.

C.   **FACTS**

Innovative and Belsky, the sole owner, principal and AP of Innovative, began operating a commodity pool in or about February 2006.  Respondents opened a commodity pool account entitled Innovative Capital Fund LLC account at a registered FCM.

From September 2006 to February 2008, Respondents fraudulently obtained funds totaling approximately $1,250,000 from five pool participants.  In Respondents' solicitation materials, they represented that any funds received from pool participants, less certain fees, would be used to purchase commodity futures and/or options contracts.  Instead of using the solicited funds as represented, Respondents misappropriated at least $385,000 of those funds.  In order to conceal their misappropriation, Respondents created commodity pool account statements that misstated the NAV and monthly rates of return of the pool and then delivered these fraudulent statements to pool participants.

In January 2008, NFA, a registered futures association, in furtherance of its official duties under the Act, began a routine audit of Innovative's commodity pool operation.  During the course of that audit, Respondents made and provided NFA with fraudulent FCM account statements for the pool.  Respondents knew that these statements falsely represented the amount of funds held in the pool account and that the statements misstated certain trading activity and certain deposits into, and withdrawals from, the pool account.  Respondents also knowingly made and provided the NFA with fraudulent bank statements for the pool that falsely represented the amount of funds the pool maintained at a bank.

On February 22, 2008, the NFA issued a Membership Responsibility Action ("MRA") that suspended the NFA memberships of Respondents, prohibited them from further trading, except for the liquidation of existing positions, and prohibited them from disbursing or transferring customer and pool funds.  At the time of the MRA, there was $763,710.88 in the pool account.

IV.

**LEGAL DISCUSSION**

A.   **Sections 4b(a)(2)(i) and (iii) of the Act:**
     **Fraud by Misrepresentation and Misappropriation**

1.   **Fraud by Misrepresentations**

Sections 4b(a)(2)(i) and (iii) of the Act provide that it shall be unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made or to be made, for or on behalf of any other person, to cheat or defraud, or attempt to cheat or defraud, such other person; or willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency

3

performed with respect to such order or contract for such person.  7 U.S.C. §§ 6b(a)(2)(i) and (iii) (2006).

To prove that a respondent has violated Sections 4b(a)(i) and (iii) of the Act, the Commission must show that: 1) the respondent misrepresented or deceptively omitted certain information regarding commodity futures trading; 2) that the misrepresentation or omission was "material"; and 3) the respondent knew the information was false and calculated to cause harm or recklessly disregarded the truth or falsity of the information (in other words, that he acted with "scienter").  *Hammond v. Smith Barney Harris Upham & Co.*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657 (CFTC Mar. 1, 1990); *In re JCC*, [1992-1994 Transfer Binder] Comm. Fut. L Rep. (CCH) ¶ 26,080 at 41,568 (CFTC May 12, 1994), *aff'd sub nom.*, *JCC, Inc. v. CFTC*, 63 F.3d 1557 (11 Cir. 1995); *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002), *cert. denied*, 543 U.S. 1034 (2004).

The scienter requirement is met when "highly unreasonable omissions or misrepresentations [are made] ... that present a danger of misleading [customers] which is either known to the Defendant[s] or so obvious that Defendant[s] must have been aware of it."  *R.J. Fitzgerald*, 310 F.3d at 1328.  A statement is material if "it is substantially likely that a reasonable investor would consider the matter important in making an investment decision."  *Sudol v. Shearson Loeb Rhoades, Inc.*, [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,748 at 31,119 (CFTC Sept. 30, 1985) (*citing TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438,449 (1976)); *Hirk v. Agri-Research Counsel Inc.*, 561 F .2d 96, 103-04 (7th Cir. 1977) (defendants violated Section 4b of the Act by making misrepresentations about the profitability of their commodity trading when soliciting customers).

Respondents misrepresented material facts by issuing solicitation materials to pool participants that stated that pool participant funds, less certain fees, would be used to purchase commodity futures and/or options contracts when in fact Respondents failed to invest the funds as promised and instead misappropriated pool funds through unauthorized withdrawals.  Respondents further misrepresented material facts by sending false account statements to pool participants regarding the NAV and rates of return of their investments.  Respondents acted with scienter because they knew that these representations were false.  Therefore, through their fraudulent representations of material facts, Respondents violated Sections 4b(a)(2)(i) and (iii) of the Act.

## 2.     Fraud by Misappropriation of Pool Participants' Funds

Misappropriation of customer funds violates Sections 4b(a)(2)(i) and (iii) of the Act.  *CFTC ex rel Kelley v. Skorupskas*, 605 F.Supp. 923, 932 (E.D. Mich. 1985) (defendant violated Section 4b(a) of the Act by misappropriating customer funds entrusted to her for trading commodity futures contracts; *CFTC v. Weinberg*, 287 F.Supp. 2d. 1100, 1106 (C.D. Cal. 2003) (CTA violated Section 4b(a)(i) and (iii) of the Act by misappropriating investor funds); *CFTC v. Noble Wealth Data Info. Serv., Inc.*, 90 F.Supp. 2d. 676, 687 (D. Md. 2000)(misappropriation of funds constitutes "willful and blatant" fraudulent activity violative of Section 4b(a) of the Act), *aff'd in relevant part, vacated in part sub nom.*, *CFTC v. Baragosh*, 278 F.3d 319 (4th Cir. 2002).

Respondents used at least $385,000 of pool participants' funds, to which they were not entitled, for their own purposes. Accordingly, Respondents misappropriated pool participant funds in violation of Sections 4b(a)(2)(i) and (iii) of the Act.

**B.   Section 4b(a)(2)(ii) of the Act:**
**Fraud by Delivery of False Account Statements to Pool Participants**

Delivering, or causing the delivery of, false account statements to commodity pool participants constitutes a violation of Section 4b(a)(2)(ii) of the Act. *Skorupskas*, 605 F.Supp at 932-33 (defendant violated section 4b(a) of the Act by delivering false monthly account statements to commodity pool participants); *Weinberg*, 287 F.Supp. at 1107 (false and misleading statements as to the amount and location of investors' money violated Section 4b(a) of the Act.); *Noble Wealth*, 90 F.Supp. 2d. at 685-87 (defendants violated Section 4b(a) of the Act through the delivery of false account statements).

Respondents violated Section 4b(a)(2)(ii) of the Act by delivering monthly account statements to Respondents' pool participants knowing that material information on those account statements, including NAV and rates of return of the pool, was false.

**C.   Section 4o(1) of the Act:  CPO Fraud by Misrepresentations, Misappropriation**
**and Delivery of False Account Statements to Pool Participants**

Section 4o(1) of the Act makes it unlawful for a CPO or an AP of a CPO by using the mails or any means or instrumentality of interstate commerce, directly or indirectly (A) to employ a device, scheme or artifice to defraud pool participants, or (B) to engage in a transaction or course of business that operated as a fraud or deceit upon pool participants. 7 U.S.C. § 6o(1) (2006). This section of the Act applies to all CTAs, CPOs and their APs whether registered, required to be registered, or exempt from registration. *Skorupskas*, 605 F.Supp. at 932. Although scienter must be proved to establish violations of Sections 4b and 4o(1)(A) of the Act, it is not necessary to prove scienter to establish a violation of Section 4o(1)(B) of the Act. *See Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 678-79 (11th Cr. 1988). Accord *In re Kolter*, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,262 (CFTC Nov. 8, 1994 (Commission cited *Messer* for this proposition with approval)).

By operating a business in the nature of an investment trust, syndicate or similar form of enterprise and by soliciting, accepting or receiving funds for the purpose of trading commodity futures or options, Innovative was acting as a CPO and Belsky was acting as an AP of Innovative. Section 1(a)(5) of the Act, 7 U.S.C. § 1(a)(5) (2006). *See, e.g., Slusser*, ¶ 27, 701 at 48,310 (respondent acted as a CPO when it accepted investment funds from individual investors who deposited funds in respondent's bank account for the purpose of trading in a commodity pool); *SEC v. Princeton Econ. Int'l*, 73 F. Supp. 2d 420, 424 (S.D.N.Y. 1999) (defendant acted as a CPO by commingling proceeds derived from sale of notes to customers in a commodity pool).

5

The same intentional fraudulent conduct that violates Section 4b(a), the fraudulent solicitations and misappropriation of funds as well as the delivery of false monthly account statements to the pool participants set forth above, also violates Sections 4o(1)(A) and (B). *Skorupskas*, 605 F. Supp. at 932-33.  Accordingly, Respondents violated Sections 4o(1)(A) and (B) of the Act.

**D.**     **Section 9(a)(4) of the Act:**
          **Making and Providing False Documents to NFA**

Section 9(a)(4) of the Act, in relevant part, makes it a violation of the Act for any person willfully to "make any false, fictitious, or fraudulent statements ... to a registered ... futures association ... acting in furtherance of its official duties under [the] Act." 7 U.S.C. § 13(a)(4) (2006).

During the course of a routine audit conducted by the NFA, a registered futures association acting in furtherance of its official duties under the Act, Respondents made false trading account and bank statements and then provided those false statements to the NFA. Further, Respondents knew that these trading and bank statements were false in that they contained fictitious trading activity and false information regarding the value of the pool's account.  By this conduct, Respondents violated Section 9(a)(4) of the Act.

**V.**

**OFFER OF SETTLEMENT**

The Respondents have submitted Offers in which they, without admitting or denying the findings herein:

A.     Admit the jurisdiction of the Commission with respect to the matters set forth in this Order;

B.     Acknowledge service of this Order;

C.     Waive: (1) the filing and service of a complaint and notice of hearing; (2) a hearing; (3) all post-hearing procedures; (4) judicial review by any court; (5) any and all objections to the participation by any member of the Commission's staff in consideration of the Offer; (6) any and all claims that they may possess under the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 (2000) and 28 U.S.C. § 2412 (2000), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Regulations, 17 C.F.R. §§ 148.1-30 (2008), relating to or arising from this proceeding; (7) any and all claims that they may possess under the Small Business Regulatory Enforcement Act, 1996 HR 3136, Pub. L. 104-121, §§ 231-232, 110 Stat. 862-63 (Mar. 29, 1996), as amended by Pub. L. No. 110-28, 121 Stat. 112 (2007), relating to or arising from this proceeding; and (8) any claim

of Double Jeopardy based upon institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.    Stipulate that the record basis upon which this Order is entered shall consist solely of the findings contained in this Order, to which Respondents have consented;

E.    Consent to the NFA being appointed as Monitor and further consent to payment of funds in the amount of $763,710.88 (seven hundred sixty three thousand seven hundred ten dollars and eighty eight cents) from the Innovative Capital Fund LLC account at MF Global LLC to an account in the name of Innovative Capital Settlement Fund maintained by the Monitor. Respondents further consent that said funds will be used to partially satisfy their restitution obligation.

F.    Consent solely on the basis of the Offer, to the entry of this Order that:

1.    makes findings by the Commission that Respondents violated Sections 4b(a)(2)(i), (ii) and (iii); 4o(1)(A) and (B); and 9(a)(4) of the Act;

2.    orders Respondents to cease and desist from violating Sections 4b(a), 4o(1)(A) and (B), and 9(a)(4) of the Act;

3.    permanently prohibits Respondents from directly or indirectly:

(a) trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006); b) entering into any commodity futures transactions and/or options on commodity futures transactions for their own accounts, for any account in which they have a direct or indirect interest and/or having any commodity futures and/or options on commodity futures traded on their behalf; (c) engaging in, controlling or directing the trading for any commodity futures account and/or options on commodity futures account for or on behalf of any other person or entity, whether by power of attorney or otherwise; and/or (d) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures contracts and/or options on commodity futures contracts;

4.    orders Respondents, jointly and severally, to pay restitution to pool participants, in accordance with Schedule A attached to the Offers, in the amount of one million, two hundred fifty thousand dollars ($1,250,000) plus post-judgment interest within ten (10) days of the date of entry of this Order;

5.    orders Respondents, jointly and severally, to pay a civil monetary penalty in the amount of one hundred thousand dollars ($100,000) plus post-judgment interest within ten (10) days of the date of entry of this Order;

6.      appoints the NFA as Monitor in this matter; and

7.      orders Respondents to comply with the undertakings consented to in the Offer and set forth in this Order.

Upon consideration, the Commission has determined to accept Respondents' Offers.

## VI.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondents each violated Sections 4b(a)(2)(i), (ii) and (iii); 4o(1)(A) and (B); and 9(a)(4) of the Act, 7 U.S.C. §§ 6b(a)(2)(i), (ii) and (iii), 6o and 13(a)(4) (2006).

## VII.

## ORDER

### Accordingly, IT IS HEREBY ORDERED THAT:

1.      Respondents shall cease and desist from violations of Section 4b(a) of the Act, as amended by The Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 13102, 122 Stat. 1651 (to be codified at 7 U.S.C. § 6b(a)).

2.      Respondents shall cease and desist from violations of Sections 4o(1)(A) and (B); and 9(a)(4) of the Act, 7 U.S.C. §§ 6o and 13(a)(4) (2006).

3.      Respondents are permanently prohibited from directly or indirectly (a) trading on or subject to the rules of any registered entity, as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29) (2006); (b) entering into any commodity futures transactions and/or options on commodity futures transactions for their own personal accounts, for any account in which they have a direct or indirect interest and/or having any commodity futures and/or options on commodity futures traded on their behalf; (c) engaging in, controlling or directing the trading for any commodity futures account and/or options on commodity futures account for or on behalf of any other person or entity, whether by power of attorney or otherwise; and (d) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity futures contracts and/or options on commodity futures contracts.

4.      Respondents are jointly and severally liable for and shall pay restitution in the amount of one million, two hundred fifty thousand dollars ($1,250,000) plus post-judgment interest (the "Restitution Obligation") within ten (10) days of the date of entry of this Order. Post judgment interest shall accrue beginning eleven days after the date of entry of this Order

8

and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961.

5.    Respondents shall direct their restitution payments to the NFA, which has been appointed to act as Monitor in this matter.  All restitution payments shall be made payable to the Innovative Capital Settlement Fund, c/o Suzanne Cech, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  Along with any restitution payment, the paying Respondent shall provide to the Monitor a cover letter that identifies the paying Respondent and the name and number of this proceeding.  The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to (a) Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, (b) Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address, and (c) Regional Counsel, Commodity Futures Trading Commission, Eastern Regional Office, 140 Broadway, 19th Floor, New York, NY 10005.

6.    Restitution shall be distributed by the Monitor to the pool participants in accordance with Schedule A attached to their Offers.

7.    Respondents shall pay, jointly and severally, a civil monetary penalty in the amount of one hundred thousand dollars ($100,000) plus post-judgment interest (the "CMP Obligation") within ten (10) days of the date of entry of this Order.  Post judgment interest shall accrue beginning eleven days after the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961. The Respondents shall pay this civil monetary penalty by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, the Respondent shall make the payment payable to the Commodity Futures Trading Commission, and send to the following address:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Marie Bateman - AMZ-300
> DOT/FAA/MMAC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> Telephone: 405-954-6569

If the payment of the CMP Obligation is to be made by electronic funds transfer, the paying Respondent shall contact Marie Bateman, or her successor, at the above address to receive payment instructions and shall fully comply with those instructions. The paying Respondent shall accompany the payment of the penalty with the cover of a letter that identifies the paying Respondent and the name and docket number of this proceeding. The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to (1) Regional Counsel, Commodity Futures Trading Commission, Eastern Regional Office, 140 Broadway,

19th Floor, New York, NY 10005; (2) Director, Division of Enforcement, Commodity Futures Trading Commission, 1155 21st Street, NW, Washington, D.C. 20581; and (3) Chief, Office of Cooperative Enforcement, Division of Enforcement at the same address.

8.    All payments by Respondents pursuant to this Order shall first be applied to satisfy the Restitution Obligation. After satisfaction of the Restitution Obligation, payments by Respondents pursuant to this Order shall be applied to satisfy the CMP Obligation.

9.    Any acceptance by the Commission or the NFA of partial payment of Respondents' Restitution Obligation and/or CMP Obligation shall not be deemed a waiver of the Respondents' respective requirements to make further payments pursuant to this Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

10.    Respondents acknowledge that failure to comply with this Order shall constitute a violation of the Order and may subject them to administrative or injunctive proceedings, pursuant to the Act.

11.    Respondents are directed to comply with the following undertakings set forth in their Offers:

a.  Neither the Respondents nor any of their agents, employees or representatives shall take any action or make any public statement denying, directly or indirectly, any findings or conclusions in the Order, or creating, or tending to create, the impression that the Order is without a factual basis; provided, however, that nothing in this provision affects the Respondents': (i) testimonial obligations; or (ii) right to take legal positions in other proceedings to which the Commission is not a party. The Respondents shall take all steps necessary to ensure that all of their agents, employees and representatives, if any, understand and comply with this agreement; and

b.  Respondents shall never apply for registration or seek exemption from registration with the Commission in any capacity, shall never engage in activity requiring registration or exemption from registration with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9), and shall not act as a principal, agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission, except as provided for in Regulation 4.14 (a)(9), 17 C.F.R. § 4.14(a)(9).

The provisions of this Order shall be effective on this date.

By the Commission

David A. Stawick
Secretary of the Commission
Commodity Futures Trading Commission

Dated: __December 18, 2008__

11